**BROWNING–FERRIS, INC.**

v.

**Louis REYNA and Stella Reyna d/b/a Condor Industries.**

No. 04–90–00702–CV.

Court of Appeals of Texas, San Antonio.

Aug. 26, 1992.

Rehearing Denied Nov. 24, 1992.

Sharon E. Callaway, Wallace B. Jefferson, Crofts, Callaway & Jefferson, Robert E. Valdez, Law Offices of Robert E. Valdez, San Antonio, for appellant.

Michael M. Fulton, Beckmann, Quirk & Fulton, San Antonio, for appellees.

Before CHAPA, BIERY and CARR, JJ.

## OPINION

CARR, Justice.

This appeal is from a judgment in a tortious interference with a contract case involving appellant, Browning–Ferris, Inc. (BFI), and appellees, Louis Reyna and Stella Reyna d/b/a Condor Industries (Condor), both of which are in the street-cleaning business. Condor originally filed suit against BFI based on negligence arising from a rear-end collision on September 21, 1987, in which a BFI truck struck a Condor street-sweeping vehicle in San Antonio, Texas. Condor later added causes of action for tortious interference with a contract and conspiracy to tortiously interfere with a contract.

Regarding the causes of action involving the contracts, Condor specifically alleged the following: (1) BFI had tortiously interfered with Condor's San Antonio street-cleaning contracts with the Texas Department of Highways and Public Transportation (the Highway Department) by intentionally causing the rear-end collision; (2) BFI had tortiously interfered with Condor's Dallas street-cleaning contract with the Highway Department by vandalizing Condor's street-cleaning equipment during a break-in at Condor's Dallas equipment yard on August 29, 1988; (3) the intentional rear-end collision and the intentional destruction of Condor's Dallas equipment were part of a civil conspiracy by BFI which constituted a tortious interference with Condor's existing Dallas and San Antonio contracts with the Highway Department.

Condor further alleged that as a result of the intentional destruction of Condor's Dallas equipment, the following events occurred in consequential order: (1) Condor could not timely perform the Dallas contract; (2) Condor defaulted on the Dallas contract; (3) the Highway Department made a claim on Condor's performance bond; (4) Condor could not obtain additional performance bonds; (5) Condor could not bid on any other Highway Department street-cleaning contracts requiring bonding; and (6) Condor could not compete with BFI.

Prior to the submission of the case to the jury, the trial court granted BFI a directed verdict on Condor's civil conspiracy cause of action because the trial court found that no evidence of conspiracy existed. The trial court then submitted the case to the jury on the negligence and tortious interference with a contract causes of action.

The jury found that BFI's negligence proximately caused the rear-end collision.

It awarded Condor $30,300 for repairs to the sweeper and $11,500 for the loss of the use of the sweeper. The jury further found that BFI, acting through its employees or agents in the course and scope of their employment, tortiously interfered with Condor's Dallas street-cleaning contract with the Highway Department. Based on this finding, the jury awarded Condor $238,000 in past lost profits and $559,000 in future lost profits. The trial court subsequently entered judgment in accordance with these findings.[1]

The issues this appeal presents are:

(1) Whether the trial court improperly allowed Reyna's expert witness, Mark Krivacka, to testify at trial on damages because he had not been properly designated as an expert witness due to a lack of verification on Reyna's discovery supplementation (point one);

(2) Whether there is sufficient evidence to support the jury's finding that BFI's agents or employees, acting in the course and scope of their employment, tortiously interfered in Reyna's performance of its Dallas contract with the Highway Department (points two through four); and

(3) Whether the damages awarded for tortious interference were (a) improper in view of the liability issue evidenced by the jury (point five); (b) established with reasonable certainty (point six); (c) supported by factually sufficient evidence (point seven); and (d) excessive (point eight).

In the first point of error, BFI contends that the trial court erred in allowing Condor's expert witness, Mark Krivacka, to testify at trial on damages. According to BFI, Krivacka had not been properly designated as an expert witness because Condor did not verify the discovery supplementation.

The record reflects that thirty-one days prior to trial, Condor supplemented its pre-

vious answers to BFI's interrogatories regarding experts Condor anticipated to call at trial. Condor noticed BFI via unsworn letter that it expected to call Mark Krivacka. Condor also provided BFI with the other information regarding Krivacka that is required to be given under Tex.R.Civ.P. 166b(6). When Condor called Krivacka to testify at trial, BFI objected on the basis that Krivacka had never been properly designated as an expert witness because Condor's supplementation letter had not been verified. The trial court overruled BFI's objection and allowed Krivacka to testify. BFI contends the trial court erred. We disagree.

■ A verification of a written and timely supplementation of answers to interrogatories is neither necessary nor required by Tex.R.Civ.P. 166b(6). *Jones v. Kinder*, 807 S.W.2d 868, 872 (Tex.App.—Amarillo 1991, no writ). In addition, the general rule is that any error in the admission of testimony is deemed harmless if the objecting party subsequently permits the same or similar evidence to be introduced without objection. *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex.1984); *City of San Antonio v. Vela*, 762 S.W.2d 314, 317–18 (Tex.App.—San Antonio 1988, writ denied).

■ The record reflects that Condor offered its Exhibit 38 as follows:

Mr. Fulton: All right, your Honor, I'll offer Plaintiff's Exhibit No. 38 *as a summary of his [Krivacka's] testimony.*

(Emphasis added.) To the above statement, BFI's counsel replied: "No objection, Judge." This exhibit is a chart completely summarizing Krivacka's testimony. In effect, the exhibit was a reoffer of Krivacka's testimony. It includes a summary, year by year, of the history of Condor's gross revenues and net operating profits from 1983 through 1989 and a projection of the total lost profits. The exhibit also contains a graph of Condor's net operating profit showing the rapid growth rate prior

---

1. The trial court later denied BFI's motion to modify the judgment or grant a new trial. In response to BFI's motion for new trial, Condor voluntarily remitted the $11,500 award. BFI then perfected this appeal based only on the portion of the judgment concerning the tortious interference with a contract.

to 1988 and the profit crash in 1988, after the default on the Dallas contract. In addition, BFI offered Exhibits 4, 5, 6, and 7, which are the Reynas' tax returns and financial statements for 1987 and 1988. These exhibits demonstrate the Reynas' prior earning power. The introduction of this evidence by BFI as well as BFI's statement of "no objection" to Plaintiff's Exhibit 38 makes any error regarding the admission of Krivacka's testimony harmless.

BFI's first point is overruled.

In BFI's points two, three, and four we are asked to decide whether any evidence exists to support the jury's finding that an employee and/or agent of BFI, acting within the course and scope of his employment or authority, committed an act of tortious interference with Condor's Dallas contract (point two); whether any evidence exists that an employee and/or agent of BFI "intentionally and willfully" interfered with Condor's Dallas contract (point three); and whether the evidence is legally and factually sufficient to support a judgment based upon tortious interference with a contract.

In addressing a "no evidence" (legal sufficiency) point, we must consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 593 (Tex.1986); *King v. Bauer*, 688 S.W.2d 845, 846 (Tex.1985). When reviewing an insufficient evidence (factual sufficiency) point, however, we consider and weigh all the evidence; we set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985). In addition, we may not simply substitute our conclusions for that of the trier of fact. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986).

Texas law protects existing and prospective contracts from interference. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 665 (Tex.1990). The elements of a cause of action for tortious interference with an existing contract are: (1) a contract subject to interference; (2) a willful and intentional act of interference; and (3) the occurrence of actual damages or loss proximately caused by the intentional act. *Id.; Champion v. Wright*, 740 S.W.2d 848, 853 (Tex.App.—San Antonio 1987, writ denied).

In the instant case, the following issue was submitted to the jury without objection as Question Number 4:

Did Browning–Ferris, Inc. acting through its employees and/or agents in the course and scope of their employment tortiously interfere in Louis Reyna and Stella Reyna, d/b/a Condor Industries' performance of its contract with the Texas Department of Highways and Public Transportation in Dallas?

The record reflects that the jury answered the question affirmatively. Because no objection was made regarding this jury submission, we will accept it as a proper statement under the facts of the case. *See Texas & New Orleans R.R. Co. v. Barnhouse*, 293 S.W.2d 261, 264 (Tex.Civ.App.—San Antonio 1956, writ ref'd n.r.e.) (court accepted definition in charge that was not criticized in any point of error); *Casas v. Knorbin*, 218 S.W.2d 289, 291 (Tex.Civ.App.—Galveston 1949, no writ) (no objection made to definition in charge). We will therefore review the evidence in light of the issue given.

Our review of the entire record reflects that Condor attempted to prove the following allegations as support of its tortious interference with a contract cause of action:

I. the BFI driver intentionally struck the Condor sweeper;

II. employees or agents of BFI refused to pay for the damage to the Condor sweeper in order to cause Condor to lose business;

III. agents or employees of BFI broke into Condor's Dallas equipment yard with the intent of delaying Condor from starting its Dallas contract on schedule; and

IV. agents or employees of BFI conspired with the Highway Department to

cause Condor to default on the Dallas contract.

We will now review each of these four bases of evidentiary support.

## I. The 1987 Collision

Condor argues that if the jury believed that BFI's driver intentionally caused the San Antonio rear-end collision, the jury could have relied on it as circumstantial evidence that BFI had a "predisposition" or "willingness" to interfere with Condor's Dallas contract. Condor further contends that the following evidence is some evidence that the BFI driver intentionally caused the collision: Eyewitness Eliseo Rios testified that there was no traffic in the lane to the right of the BFI garbage truck, and nothing prevented the BFI truck from moving around the Condor street sweeper.[2] Condor also relies on Rios' testimony that the BFI truck's brake lights did not come on until a second before the impact.

We find that the evidence Condor relies on is no evidence that BFI's driver *intentionally* struck Condor's sweeper or that BFI tortiously interfered with any of Condor's contracts. We further find that no evidence exists in the record to support the allegation. In addition, the parties do not dispute that the Dallas contract BFI allegedly interfered with did not exist at the time of the September 21, 1987, accident. An essential element of a cause of action for tortious interference with a contract is that there be an existing contract at the time of the alleged act of tortious interference. *Juliette Fowler Homes*, 793 S.W.2d at 664; *Champion*, 740 S.W.2d at 853. The Dallas contract, the basis of Condor's tortious interference claim contained in Question No. 4, was not executed until August 12, 1988.[3] Accordingly, Condor's first category of evidence fails to support

the tortious interference as a matter of law.

## II. BFI's Alleged Refusal to Pay Repairs

Condor argues that BFI's refusal to pay the repairs of the sweeper involved in the San Antonio collision is some evidence that BFI intended to tortiously interfere with BFI's Dallas contract. Condor specifically contends that the following evidence is some evidence of that intention: At the time of the accident, Condor had a total of four sweepers; the loss of the sweeper caused substantial problems for Condor in completing the San Antonio contract; Mr. Reyna testified that he tried on several occasions to get someone at BFI to discuss paying for the damage to his street sweeper, but no one would even talk to him about it; Reyna was dealing directly with BFI because no insurance company was involved; and Condor's letter to BFI's attorneys, dated June 3, 1988, put BFI on notice of Condor's special need for its damaged sweeper and that the loss of any additional sweepers would make it very difficult for Condor to complete any additional contracts obtained.

We first find that this evidence is no evidence that BFI intended to tortiously interfere with any contracts. The evidence simply shows that BFI did not pay for the damage upon demand. Such conduct, however, is not tantamount to intentionally interfering with a contract. *See Aramco Services Co. v. Redland Fabricating & Welding, Inc.*, 752 S.W.2d 184, 188 (Tex. App.—Houston [14th Dist.] 1988, no writ)[4] (no evidence of malicious, intentional, or excusable interference with contract); *Frost Nat'l Bank v. Matthews*, 713 S.W.2d 365, 369 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.) (no evidence of wrongful interference).

---

**2.** According to the BFI driver involved in the collision, he hit the Condor sweeper because a small car was in the lane next to him, and he could not move around the Condor sweeper.

**3.** No question was submitted to the jury regarding the San Antonio contract.

**4.** In an unpublished opinion, the Texas Supreme Court modified *Aramco* so that the judgment did not reflect reversal as to a party that had not filed an appeal. *See Redland Fabricating & Welding, Inc. v. Aramco Services Co.*, No. C–7785, 1989 WL 62253 (Tex.1989) (not designated for publication).

Second, the evidence is undisputed that Condor's demand for payment of repairs to its street sweeper were made before the existence of the August 12, 1988, Dallas contract. *See Juliette Fowler Homes,* 793 S.W.2d at 664; *Champion,* 740 S.W.2d at 853. Accordingly, this second attempt fails as a matter of law to support the tortious interference claim.

### III. The 1988 Dallas Break-in

■ The third category of evidence concerns the break-in at Condor's Dallas equipment yard. No evidence exists that any agent or an employee of BFI had any part in the break-in. The only evidence regarding the break-in concerns the specifics of what was taken and what equipment was damaged. There is no identification of any BFI employee or agent who might have committed such an act or a showing that this person was acting within the course and scope of his employment or acting intentionally or willfully. Like the plaintiff in *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 486 (Tex.App.—Corpus Christi 1989, writ denied), Condor presented nothing but pure speculation that BFI interfered with its Dallas contract by orchestrating a break-in of the equipment yard. We find, therefore, that this third attempt at supporting the tortious interference claim also fails as a matter of law.

### IV. BFI's Conspiracy With the Highway Department Inspectors [5]

■ Condor contends that there is some evidence that reasonably implies a conspiracy between employees and/or agents of BFI, acting in the course and scope of their employment, and the Highway Department inspectors to tortiously interfere with Condor's Dallas contract. This evidence can be summarized as follows:

(1) a large amount of street-cleaning business was at stake;

(2) Condor was a tough competitor of BFI;

(3) Highway Department inspectors put unreasonable restrictions on Condor's work in Dallas;

(4) John Dowell, the Highway Department inspector for the Dallas contract, told Mr. Reyna that he and Connie Jones, the Highway Department supervisor in Dallas, "were working with BFI" to get Condor out of the Dallas contract.

(5) BFI benefited from Condor's default.

BFI argues that the state of evidence in the record concerning conspiracy is irrelevant and not before this court because Reyna has not appealed the trial court's directed verdict on Reyna's conspiracy cause of action. We note that no such limiting instruction was requested or given to the jury. Therefore, we will review the evidence in the record, including the conspiracy evidence, in the context of our evidentiary focus of Condor's tortious interference claim.

The evidence in the record reflects that BFI and Condor were business competitors. In 1987 Condor underbid BFI for the Highway Department street-sweeping business in the San Antonio area and in 1988 again successfully underbid BFI and others for the Dallas contract. At this time BFI was the only street-sweeping contractor with Highway Department contracts in Dallas' District 10. Condor's Dallas contract was inspected by Highway Department Inspector John Dowell and supervised by Highway Department Supervisor Connie Jones.

Louis Reyna testified that on September 26 or 27, 1988, Dowell came to his construction trailer and had a conversation with him concerning Condor's contract. The following question and answer were received into evidence with no objection:

Q: And tell me the substance of the conversation.

A: Mr. Dowell told me [Reyna] that he [Dowell] and Connie Jones were working with BFI to get us out of the contract.

5. In Condor's last pleading, it did not plead conspiracy between BFI employees or agents and the Highway Department inspectors. How-ever, we conclude that the matter was tried by consent.

Reyna further testified that Dowell told him that Condor was going to be defaulted "no matter what" Reyna did. Reyna testified that in the same conversation Dowell told him that he could save Condor's bonding if Reyna would talk to James Hortenstein, BFI Southwest Regional Manager, to see if BFI would take over the contract. Reyna's testimony also reflects the following: He called Hortenstein while Dowell was in his trailer, but he was unable to reach Hortenstein and left a message for Hortenstein to return his call. When he got in touch with Hortenstein, he told Hortenstein that he had been told that Jones and Dowell wanted BFI to take over the contract and that Condor was going to be defaulted unless he could get BFI to take over the contract. BFI refused to take over the contract.

During Hortenstein's testimony, he admitted having the above-mentioned conversation with Reyna. He testified that Reyna had called him and stated that Condor was having trouble with the Highway Department and asked if BFI would be interested in taking over the contract.

It is also pertinent to note that neither John Dowell nor Connie Jones was ever called during the trial to controvert Dowell's alleged declaration to Reyna.

The record also contains evidence of examples of requirements and restrictions placed on Condor's work on the Dallas contract by John Dowell and/or Connie Jones. Condor contends that those were unreasonable and arbitrary and were never placed on BFI's work on the same contract area before or after Condor's contract:

### (1) Bryant Street Exit Ramp

John Dowell required Condor to make very time-consuming (4½ hours) lane closures on the Bryant Street exit ramp before sweeping operations were allowed at that location. However, Connie Jones testified by deposition that the Bryant Street exit ramp was an exception to the lane-closure rule and that no lane closures were necessary before sweeping that exit ramp.

### (2) Three Sweepers or None

On September 19, 1988, Connie Jones placed a requirement on Condor that if it did not have three sweepers on the job at all times, no sweepers would be allowed to operate.

### (3) Weekend and Sunday Work

On September 16, 1988, a meeting was held between Connie Jones, John Dowell, and Louis Reyna. Reyna testified that Jones and Dowell agreed in that meeting that Condor could work on Sunday mornings to catch up. However, in the final letter of default, the Highway Department specifically cited the fact that Condor had worked on a Sunday (September 25) as one of the reasons for the default.

### (4) Weekly Sweeping

The Dallas contract required certain sections of Highway 45 to be swept on a weekly basis. Condor showed up with its sweepers on September 16, 1988, and attempted to sweep these sections, but Jones did not let Condor do so. Instead, Jones instructed Condor to sweep a completely different road. Then, as shown in the final letter of default, the Highway Department used the lack of progress on the sections Condor was supposed to sweep on a weekly basis as a specific ground for default. Prior to the default in Dallas, Condor had successfully completed approximately forty contracts without any problems with the State. As a net result of Condor's default in Dallas, BFI ended up with the Dallas contract on which Condor was defaulted.

We find that the evidence in the record is some evidence and sufficient evidence to support the jury's finding to Question 4. Accordingly, we will not substitute our judgment for that of the jury. BFI's points two, three, and four are rejected.

### Damage Issue

In the fifth point of error, BFI contends that the damages awarded for tortious interference were improper in view of the liability issue given to the jury.

The record reflects that Condor secured an affirmative finding on liability in Questions 4 [6] and 6 [7] for the tort of interference with an existing contract. The elements of that cause of action are:

(1) a contract subject to interference exists;

(2) a party willfully and intentionally interferes with that contract;

(3) the intentional act is a proximate cause of damages; and

(4) actual damages occur.

*Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 664 (Tex.1990); *Champion v. Wright,* 740 S.W.2d 848, 853 (Tex.App.—San Antonio 1987, writ denied). Condor, moreover, procured damage findings in Question 7 [8] for lost profits.

 BFI contends that the award under Question 7 for lost profits in the future constitutes "future loss," which is awardable only in the case of tortious interference with *prospective* contractual relations. To prove tortious interference with prospective contractual relations, the plaintiff must establish that:

(1) there was a "reasonable probability" of entering into a contractual relationship;

(2) the defendant acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming the plaintiff;

(3) the defendant was not privileged or justified; and

(4) actual harm or damage occurred as a result.

*Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 565 (Tex.App.—Dallas 1989, no writ); *Lone Star Steel Co. v. Wahl,* 636 S.W.2d 217, 222 (Tex.App.—Texarkana 1982, no writ). BFI contends that because the jury failed to find malice in Question 8 [9], the award of $559,000 for lost profits in the future was improper. *See Gillum,* 778 S.W.2d at 565 (malice is essential element of tortious interference with *prospective* contractual relations).

**6.** QUESTION NO. 4

Did Browning–Ferris, Inc. acting through its employees and/or agents in the course and scope of their employment tortiously interfere in Louis Reyna and Stella Reyna, d/b/a Condor Industries' performance of its contract with the Texas Department of Highways and Public Transportation in Dallas?
Answer "Yes or "No."
Answer: Yes

**7.** QUESTION NO. 6

Do you find from a preponderance of the evidence that it was fairly and reasonably within the contemplation of Browning–Ferris, Inc. at the time it committed acts of tortious interference, if any, that as a result thereof Louis Reyna and Stella Reyna, d/b/a Condor Industries would be unable to obtain performance bonding necessary to thereafter contract with the Texas Department of Highways and Public Transportation on Contracts requiring such performance bonding?
Answer "Yes" or "No."
Answer: Yes

**8.** QUESTION NO. 7

What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate LOUIS and STELLA REYNA d/b/a CONDOR INDUSTRIES for the damages sustained by their inability to obtain performance bonding for Contracts with the Texas Department of Highways and Public Transportation requiring such bonding.
Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element.
a) The resulting loss of net profits, which to a reasonable degree of certainty were suffered in the past.
Answer in dollars and cents, if any.
We, the Jury, answer: $238,000.00
b) The resulting loss of net profits, which to a reasonable degree of certainty they will suffer in the future.
Answer in dollars and cents, if any.
We, the jury, answer: $559,000.00

**9.** QUESTION NO. 8

Did Browning–Ferris, Inc. act with malice in tortiously interfering with Louis Reyna and Stella Reyna, d/b/a Condor Industries' contract with the Texas Department of Highways and Public Transportation in Dallas?
Answer "Yes" or "No."
Answer: No
"Malice" means: Ill-will, spite, evil motive, or purposing the injury of another.
You are instructed that in order for Browning–Ferris, Inc. to act with malice you must find that an agent or employee of Browning–Ferris, Inc. employed in a managerial capacity and acting in the scope of his employment committed such tortious interference, if any.

We disagree with BFI for the following reasons. At the outset we point out that BFI has mischaracterized the type of award in Question 7: The jury's award for lost profits in the future was in fact for "consequential" damages resulting from the tortious interference with an *existing* contract. In addition, from our reading of the record, it appears that the jury was asked about malice to determine if exemplary damages should be awarded. In any event, the record does not reflect that Condor ever pleaded a cause of action for the tort of interference with prospective contractual relations.

The consequential damages awarded in this case were for the lost profits Condor sustained by defaulting on the Dallas contract with the Highway Department and the resulting loss of Condor's bondability. We find that Condor's damages were a foreseeable consequence of BFI's tortious interference with such an important contract, the default of which resulted in Condor's loss of bondability.

The damages the jury awarded are authorized by the RESTATEMENT OF TORTS (SECOND) § 774A (1977), which provides:

One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for

(a) the pecuniary loss of the benefits of the contract or the prospective relation;

(b) *consequential losses* for which the interference is a legal cause; and

(c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.

RESTATEMENT (SECOND) OF TORTS § 774A (1977) (emphasis added). The language of this section suggests that pecuniary losses and consequential losses are available for each of the two torts: tortious interference with an existing contract and tortious interference with prospective business relations. *See Exxon Corp. v. Allsup,* 808 S.W.2d 648, 660 (Tex.App.—Corpus Christi 1991, writ denied); *Gonzalez v. Gutierrez,* 694 S.W.2d 384, 390 (Tex.App.—San Antonio 1985, no writ).

BFI largely relies on the same section for its argument that the award was improper. BFI has taken one line in comment b of section 774A to reinforce its argument that recovery for future damages is awardable only for the tort of interference with *prospective* business relations. Nothing in the comment suggests that this is a remedy exclusively reserved for that tort. To adopt BFI's reasoning would mean that a party could only recover actual damages for interference with existing contracts. However, exemplary damages have been awarded in such cases before. *See Armendariz v. Mora,* 553 S.W.2d 400, 407 (Tex. Civ.App.—El Paso 1977, writ ref'd n.r.e.).

The description of damages for each tort is very similar. Damages for interference with an existing contract arise when there is an occurrence of actual damages or loss. *Juliette Fowler Homes, Inc.,* 793 S.W.2d at 664. Damages for interference with prospective business relations arise when actual harm or damage occur as a result of the interference. *Gillum,* 778 S.W.2d at 565.

Damages are awardable for the natural and probable consequences of a wrong act; in other words, a party can recover the reasonably foreseeable damages under the pertinent circumstances of a case. *Commonwealth of Massachusetts v. Davis,* 140 Tex. 398, 168 S.W.2d 216, 222 (1942), *cert. denied,* 320 U.S. 210, 63 S.Ct. 1447, 87 L.Ed. 1848 (1943).

Based on the record before us and the foregoing analysis, we find that Condor is entitled to the loss of profits in the future because BFI could have foreseen that the interference with the existing contract between Condor and the Highway Department would have resulted in such an injury. *See* RESTATEMENT (SECOND) OF TORTS § 774A (1977).

The fifth point of error is overruled.

In the sixth and seventh points of error, BFI asserts that there was no evidence, or, alternatively, insufficient evidence to support the jury's award under Question 7.

The general rule is that an injured party may recover damages for lost

profits by showing that the loss is a natural and probable result of the act or omission complained of and that the amount of profits that the party would have earned is reasonably certain. *Orchid Software, Inc. v. Prentice–Hall, Inc.*, 804 S.W.2d 208, 210 (Tex.App.—Austin 1991, writ denied). Precise calculation of anticipated profits has never been essential to recovery by any business. *Id.*, at 211. It is sufficient if there is data from which the loss may be ascertained with reasonable certainty. *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938); *Orchid Software*, 804 S.W.2d at 211. In *Southwest Battery*, the Texas Supreme Court enunciated the following test to determine the lost profits of an established business such as Condor:

> Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such preexisting profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought. Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in business which might have been expected in the light of past development and existing conditions.

115 S.W.2d at 1098–99; *see Orchid Software* 804 S.W.2d at 210–11 (new business).

■ In the case before us, there was ample evidence as to Condor's damages. Mark Krivacka, a certified public accountant from San Antonio, Texas, testified about a reasonable manner of projecting what Condor's income would have been from 1988 to the time of trial had Condor not defaulted on the Dallas contract with the Highway Department. Krivacka testified that if an adjustment were made to the 1987 net operating profit due to the loss of the sweeper from the rear-end collision, Condor's income would have been $97,000 for 1987. Krivacka further testified that projecting this adjusted 1987 net operating

profit at a 15% growth rate into 1988 would have shown an $115,000 net operating profit for that year and a $136,000 net operating profit for 1989. If the jury calculated the lost net operating profit in the past by adding $115,000 for 1988 to $136,000 for 1989 and subtracting the actual $25,075 that was made in 1988 but adding the $35,128 loss that was incurred in 1989, the jury would have arrived at the sum of $261,053 for lost net earning in the past. The jury's answer to Question 7(a) concerning lost profits in the past was $238,000. We find that this award was reasonable based on the evidence the jury heard.

Krivacka further testified that it was reasonable to project a continued growth of net operating profit into the future because there was no reason to believe that Condor would not have continued with its business. Krivacka testified that from 1990 to 1995, a 15% growth rate would be reasonable, but in the interest of being conservative, he used a 10% growth rate for those years. If the jury simply started with the $136,000 for 1989 and applied a 10% compounded growth factor through 1995, the total undiscounted lost net operating profit would have been $1,154,254. Krivacka testified that the amount would be $700,000 if it were discounted at 12%. The jury's answer to Question 7(b) regarding lost net profits in the future was $559,000.

■ BFI argues that the basis for assessing Condor's lost profits was too "speculative." According to BFI, there is no proof that Condor would have been awarded a specific contract, bid, or lease in the future. As support, BFI relies on *Gonzalez v. Gutierrez*, 694 S.W.2d 384 (Tex. App.—San Antonio 1985, no writ). In that case, however, this court implied that to support the award there had to be evidence that: (1) a specific contract would be awarded; (2) the net earnings would have been a specific amount; *or* (3) there were specific pecuniary losses. In that case there was no such evidence. But in this case there is evidence of what Condor's net earnings would have been and what the specific pecuniary losses were. We therefore find that there was some and sufficient evidence to support the jury's award for lost profits under Question 7.

In the last point of error, an alternative argument to points of error six and seven, BFI argues that the trial court erred in overruling BFI's request for remittitur because the award of damages is excessive. BFI specifically argues that the award for lost profits in the future should be reduced by $100,000.

The proper standard of review regarding remittitur is factual sufficiency. *Snoke v. Republic Underwriters Ins. Co.*, 770 S.W.2d 777, 777–78 (Tex.1989). The court of appeals must examine all the evidence in the record to determine whether sufficient evidence supports the damages award and remit only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986).

After reviewing the evidence regarding Condor's lost profits, which we have outlined above, we find that the evidence supporting the $559,000 award is not manifestly unjust or against the great weight and preponderance of the evidence. We therefore do not grant BFI's request for a remittitur.

The last point of error is overruled.

The judgment is affirmed.