NUMBER 13-08-00268-CV


COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


SJW PROPERTY COMMERCE, INC. N/K/A

LEASING HOLDING, INC., AND PROPERTY

COMMERCE DEVELOPMENT COMPANY N/K/A

DEVELOPMENT HOLDING, INC., Appellants,


 v.


SOUTHWEST PINNACLE PROPERTIES, INC.,

JACKSON I CORP., PALMER ENTERPRISES, INC.,

AND G.J. PALMER, JR., INDIVIDUALLY, Appellees.

 
 

On appeal from the County Court at Law No. 2

 of Hidalgo County, Texas.

 


 O P I N I O N


Before Chief Justice Valdez and Justices Benavides and Vela

 Opinion by Chief Justice Valdez

 

 This case pertains to agreements between several parties for the development of
property at Jackson Palmer Crossing located near the intersection of Business Highway
83 and Jackson Road in McAllen, Texas, and at the northeast corner of 10th Street and
Trenton Road, also in McAllen. Appellants, SJW Property Commerce, Inc. ("SJW") and
Property Commerce Development Company ("PCDC"), and appellees, Southwest Pinnacle
Properties, Inc. ("SPP"), Jackson I Corp ("Jackson"), Palmer Enterprises ("PE"), and G. J.
Palmer Jr., individually, complain about a jury verdict in which: (1) SJW was awarded
$126,903.73 against SPP and PE and $38,400 against SPP and Jackson for damages
associated with appellees' alleged failure to pay commissions owed for bringing tenants
to the Jackson Palmer Crossing shopping center; (2) Palmer, individually, was awarded
$709,587 in actual damages against SJW and PCDC, $376,397 and $2,000,000 in punitive
damages against PCDC and SJW, respectively, associated with Palmer's breach of
fiduciary duty and fraud claims; (3) SJW was awarded $55,767.91 in attorney's fees; and
(4) appellees were awarded $390,152.23 in attorney's fees for work done at the trial court
level, $30,000 for an appeal to this Court, $30,000 for an appeal to the Texas Supreme
Court, and $100,570.23 in expenses. 

 By four issues, SJW and PCDC argue that: (1) SPP had no standing to bring suit
and, therefore, its inclusion in the suit did not toll the applicable limitations period; (2) the
evidence supporting the jury's finding that SJW and PCDC intentionally interfered with
Palmer's alleged contracts is legally and factually insufficient; (3) the trial court erred in
assessing exemplary damages against SJW and PCDC; and (4) the trial court erred in
awarding Palmer his attorney's fees. By one cross-issue, appellees assert that the
evidence supporting the jury's award for damages associated with the commissions is
legally and factually insufficient. We affirm, in part, and we reverse and render, in part.

I. Factual Background

A. The Jackson Palmer Crossing Location

 In the early 1990's, Palmer first met Stanley J. Williams and Stanley Jay Williams
Jr. ("Jay Williams"), both of SJW. (1) Over the course of a couple of years, Palmer and SJW
discussed the development of land that Palmer had acquired from his family near the
intersection of Jackson Road and Business Highway 83 in McAllen. Palmer and his
companies are involved in the development of various properties in the Rio Grande Valley,
while SJW facilitates the development of properties nationwide by acting as a broker and
liaison with "big box" retailers, such as Target, Best Buy, and Home Depot, which often
serve as anchor tenants for shopping centers. (2) Palmer contracted with SJW to develop
the property near the intersection of Jackson Road and Business Highway 83, later named
Jackson Palmer Crossing, whereby SJW served as Palmer's broker "in connection with the
leasing and sale of the Property." The parties signed an "Exclusive Leasing and Sales
Listing Agreement" (the "Listing Agreement") to memorialize the relationship. The Listing
Agreement provided that: (1) the commencement of the agreement was June 30, 1999;
(2) the agreement expired on June 30, 2000; and (3) Palmer was to pay SJW a 6% sales
commission, a 4% commission for "total lease rental for the primary term (years 1-10)" and
a 2% commission "of the total rental for the primary term (years 11-20) of each lease if
Broker is the sole source of tenant." 

 During the original term of the Listing Agreement, SJW allegedly secured Fashion
Bug and Staples as tenants in the shopping center at Jackson Palmer Crossing. (3) The
record reflects that, on July 3, 2000, a couple days after the Listing Agreement supposedly
expired, SJW secured Factory 2-U as a tenant in the Jackson Palmer Crossing shopping
center. The record also includes a letter sent by Palmer to SJW on July 6, 2000,
requesting that the term of the Listing Agreement be extended an additional thirty days
from the June 30, 2000 expiration date. In response to Palmer's July 6, 2000 request,
SJW sent another Listing Agreement to Palmer extending the term from June 30, 2000 to
June 30, 2001. However, this agreement was signed by Jay Williams, as president of
SJW, but it was not signed by Palmer. 

C. The 10th Street and Trenton Location

 1. Palmer's Allegations

 At some point during the transactions pertaining to the Jackson Palmer Crossing
shopping center, Palmer alleges that he began discussing a second development project
with Stanley and Jay Williams. The second development project was located at the
northeast corner of 10th Street and Trenton Road in McAllen (the "Trenton Project"). At
the beginning of the project, the property was primarily farmland; however, a small portion
of the land already had a gas station and a McDonald's restaurant situated on it. Palmer
further alleges that, when he began discussing the second development project with
Stanley and Jay Williams, he asked them to continue to act as his broker, and they agreed
to do so. No contract was signed to memorialize the purported brokerage agreement. 

 In any event, Palmer asked his friend, Butch Schwartz, a local realtor, to begin
assembling the property at the northeast corner of 10th Street and Trenton. Schwartz was
familiar with the property because he sold portions of the tracts to the existing owners, and
he was listing the tracts for sale. Among the tract owners were B.R Whisenant; Wayne
and Gelee Allen; Bill and Opal Baldwin; Yvonne Robinson; Harlon and Mary Robinson; and
Michael Kilgore, M.D. Most of the tract owners were descendants of the Robinson family.

 Palmer states that, in 1998, SJW began providing "key services" for him in the
development of the Trenton Project. According to Palmer, SJW contacted several of the
same "big box" retailers that it had previously contacted for the Jackson Palmer Crossing
development. Among the retailers contacted by SJW on Palmer's behalf was Albertson's
grocery store; however, Albertson's initially declined to participate. 

 Palmer notes that he regularly attends an annual convention in Las Vegas
conducted by the International Counsel of Shopping Centers ("ICSC"). Palmer recalled
that, in 1999, he was invited to the ICSC convention by Stanley and Jay Williams to
discuss the Trenton Project at Le Montrachet, a restaurant located in the Las Vegas Hilton
Hotel. Whisenant and his wife accompanied Palmer and his wife to the 1999 ICSC
convention to meet with Stanley and Jay Williams at Le Montrachet to discuss the Trenton
Project.

 Palmer also recalls that Jay Williams and Clay Trozzo, a broker for PCDC and SJW
and Jay Williams's brother-in-law, invited Palmer to go hunting in Encino, Texas, so that
the parties could discuss progress on the Trenton Project. Jay Williams and Trozzo
allegedly explained to Palmer that Albertson's was again interested in being the anchor
tenant for the Trenton Project, so Steve Jarvios, an Albertson's representative, was invited
to hunt as well. However, upon arriving, Jarvios explained to the parties that he had just
resigned from Albertson's and that he was now working for Lowe's Home Improvement
Centers. Despite this disclosure, the parties allowed Jarvios to stay and hunt with them.

 Later, the parties discovered that Albertson's was no longer interested in the site,
so Jay Williams and Trozzo began searching for a new anchor tenant for the property. 
Eventually, Jay Williams and Trozzo were able to interest Target, a long-time client of
SJW, in the location. On March 15, 2000, Trozzo allegedly sent Schwartz and Palmer a
letter of intent, indicating that PCDC intended to purchase, on Palmer's behalf, 13.34 acres
at the northeast corner of 10th Street and Trenton from the landowners for $2.3 million and
that Palmer would be responsible for paying SJW a 6% commission from the total sales
price. Essentially, the purchase of the tracts of land for $2.3 million would create one large
tract of land with one owner, Palmer, who would then sell the land to Target for
development of a store and possibly an attached shopping center. 

 On March 17, 2000, Palmer sent Trozzo a letter of intent to sell approximately 18.85
acres of land located at the northeast corner of 10th Street and Trenton to SJW for $4.9
million, plus a 6% broker's commission for SJW. At this time, Palmer did not have any of
the land under contract; however, he apparently intended to assemble the land via earnest
money contracts to sell the land to SJW who would, in turn, sell the land to Target for
development. On March 21, 2000, Trozzo, acting as a representative of PCDC, countered
Palmer's offer with a letter of intent to purchase 13.34 acres of the property from Palmer
for $2.6 million plus a 6% commission for SJW.

 In light of his discussions with SJW and PCDC, Palmer began approaching the
owners of the tracts in an attempt to assemble the land through earnest money contracts. 
The process of assembling land for future development is a delicate process that requires
speed, secrecy, and timing. Palmer signed earnest money contracts with the landowners. (4) 
Most of the contracts: (1) provided for a 120-to-150-day "feasibility period"; (2) gave
Palmer the exclusive right to purchase the property; and (3) expired on April 15, 2000. (5) 
Palmer was able to assemble all of the necessary tracts of land, except for one--a 3.7-acre tract owned by Dr. Kilgore. (6) Palmer's failure to secure an earnest money contract
from Dr. Kilgore severely jeopardized the Trenton Project because Dr. Kilgore's tract was
situated in such a way that prevented Palmer from selling the package of land to Target
for further development.

 As negotiations proceeded in the assembly of the tracts for presentment to Target,
Stanley and Jay Williams invited Palmer to the 2000 ICSC convention to further discuss
the Trenton Project. At the 2000 ICSC convention, Palmer updated Stanley and Jay
Williams as to the progress of his negotiations with the landowners. In these discussions,
Palmer conveyed confidential price information and acknowledged that he did not have Dr.
Kilgore under contract. According to Palmer, Trozzo, after learning that Palmer was unable
secure an earnest money contract with Dr. Kilgore, got Dr. Kilgore to sign a letter of intent
on June 6, 2000, indicating that PCDC would purchase Dr. Kilgore's land and that SJW
would receive a 6% brokerage commission. (7) However, Trozzo repeatedly informed Palmer
that Dr. Kilgore was not under contract, even though he really was, and never once told
Palmer that Dr. Kilgore intended to sell his property to SJW and PCDC.

 The landowners secured by Palmer's earnest money contracts began to worry about
whether the project would be completed as the expiration date of Palmer's earnest money
contracts neared. Palmer contacted Trozzo to relay additional pricing information that he
had received, inform Trozzo that his earnest money contracts were expiring, and to request
a letter of intent from Dr. Kilgore indicating that he was going to sell his property to SJW
or PCDC. (8) At this time, Palmer believed that: (1) SJW and PCDC were working as his
broker to get Dr. Kilgore under contract; and (2) by showing the landowners that he had
a letter of intent from Dr. Kilgore, the landowners would elect to extend their contracts with
Palmer and allow the Trenton Project to come to fruition. Jay Williams informed Palmer
that Dr. Kilgore was not under contract and that no assurances would be provided. Around
this time, several of the landowners attempted to contact Dr. Kilgore to inquire about the
status of his property so that the Trenton Project could be completed. In fact, Wayne Allen
wrote an impassioned letter to Dr. Kilgore and even visited Dr. Kilgore's office,
masquerading as a walk-in patient in order to ask Dr. Kilgore about what it would take to
complete the deal. Wayne and the other landowners were consistently rebuffed and
ignored by Dr. Kilgore, who was apparently under contract with PCDC at this time.

 Shortly before Palmer's earnest money contracts expired, Trozzo approached the
landowners to inquire about whether the landowners were still under contract. Trozzo's
efforts were memorialized in one such letter, dated September 7, 2000, to Harlon and Mary
Robinson which stated the following: "Thank you for the opportunity to meet you in
McAllen, Texas[,] last week. We did not realize your property on Trenton was currently
under contract with another party. We hope that all goes well with your transaction and
you [] reach your goals with your sale." Palmer alleges that Trozzo, SJW, and PCDC were
aware at all times of the existence of his earnest money contracts with the landowners and
that Trozzo's meeting with the landowners was for the purpose of inducing the landowners
to breach Palmer's earnest money contracts so that SJW and PCDC could get the
landowners under contract and package the land for sale to Target themselves. (9)

 On September 6, 2000, Opal Baldwin sent Palmer a letter stating the following: 
"Please be advised that for various reasons, including Paragraph 5 of the Unimproved
Property Commercial Contract, Mrs. Baldwin considers the contract concerning her
property as terminated and null and void." (Emphasis in original.) Subsequently, on
September 8, 2000, Harlon and Mary Robinson sent Palmer a similarly-worded letter
terminating their contract with Palmer. On September 13, 2000, Trozzo, on behalf of
PCDC, sent Palmer a letter requesting proof that Palmer had "control of the Property" by
providing PCDC with copies of "receipted contracts with the title company." Trozzo also
noted that Palmer's failure to provide copies of the contracts would result in SJW and
PCDC dealing directly with the landowners.

 After receiving the various termination letters and Trozzo's September 13, 2000
letter, Palmer believed that "he had been betrayed." Thus, in response to Trozzo's
September 13, 2000 letter, Palmer sent Trozzo, SJW, and PCDC a letter stating that: (1)
they had tortiously interfered with Palmer's earnest money contracts with the landowners;
(2) as a result of the interference and accompanying delay in the development process,
"[y]our [Trozzo, SJW, and PCDC] actions have tarnished my reputation as a developer in
the community and have resulted in substantial financial loss to me"; and (3) "[y]our letter
of September 13, 2000 appears to be nothing more than a self-serving attempt to disguise
the damage you have caused." In response to SJW and PCDC's purported actions,
Palmer began to withhold commissions from Jackson Palmer Crossing, thinking that it was
not fair to pay the commissions when SJW and PCDC had betrayed him. Palmer also
refused to renew the Listing Agreement he had with SJW at Jackson Palmer Crossing.

 Now believing that SJW and PCDC were acting counter to his interests, Palmer
hired Trammell Crow Company as his new broker on the Trenton Project, and they
convinced the landowners to renew their earnest money contracts with Palmer in hopes
of packaging the land to Target or another anchor tenant. (10) However, shortly thereafter,
Target, Home Depot, and SJW allegedly pressured Trammell Crow to stop acting as
Palmer's broker. Target then instructed the landowners to deal directly with SJW and
PCDC, rather than Palmer.

 Later, Jarvios, now with Lowe's, informed the landowners that Lowe's would be
interested in developing the site. Using this information, Palmer was able to secure
another 180-day contract with the landowners. At some point, Jarvios allegedly received
an "aggressive and irate" phone call from a Target representative attempting to prevent
Lowe's from developing the site. Jarvios proposed that Lowe's and Target work together
to develop the site; however, SJW and PCDC could not be involved because SJW and
PCDC also represented Home Depot, one of Lowe's competitors. Target did not respond
to Jarvios's proposal.

 In May 2001, Stanley Williams called Palmer and proposed a meeting to try to work
out the problems associated with the Trenton Project. Palmer agreed to meet as long as
Trozzo and Jay Williams were not involved in the deal because Palmer believed that
Trozzo and Jay Williams were the main perpetrators of the earlier deception. Palmer's
sentiments regarding Trozzo and Jay Williams were also echoed by the landowners. After
meeting with Stanley Williams, Palmer agreed to assign the landowners' property that he
had under contract to Target for no profit. In exchange for this assignment, Palmer
received a conditional reciprocal easement agreement ("REA"). The REA was conditioned
on Palmer purchasing, within twelve months, at least ten acres of land to the north of the
Trenton Project owned by Eugene J. Kayser Jr. At the time of the negotiations with
Stanley Williams, Palmer notes that he was already in the midst of negotiations with Kayser
to develop the tract of land adjoining the Trenton Project. The REA was valuable to
Palmer because it allowed for traffic to cross parts of the Target property to access land
to the north of the Trenton Project, where the Kayser tract is situated. Without the REA,
Palmer would have had a very difficult time marketing and developing the Kayser tract, as
access to the land would be impeded. Palmer alleges that Stanley Williams knew that the
REA was crucial to Palmer's development of the Kayser tract and that Stanley Williams
used the REA as leverage to obtain the assignment of the landowners' property with no
markup.

 Palmer later discovered that, despite his insistence on Trozzo not being involved in
the renewed negotiations with SJW and PCDC, Trozzo was indeed involved in the
transactions and that Trozzo's involvement had been hidden from Palmer from May to
December 2001. Trozzo, on behalf of SJW, attempted to purchase the Kayser tract for $3
million, which was significantly more than the $1,960,000 bid Palmer had previously made. 
Palmer believed that SJW's $3 million bid for the Kayser tract was an attempt by SJW to
bid up the price of the Kayser tract to prevent Palmer from purchasing the tract and,
therefore, rendering the REA meaningless. In addition, Palmer found out that Stanley and
Jay Williams formed a single-asset entity, McAllen Shopping Center, Ltd., and acquired a
portion of the Trenton Project for their own development. This portion of the Trenton
Project was eventually sold by SJW to Chick-Fil-A. (11) 

 In the end, the Trenton Project was developed with Target being the anchor tenant. 
Target purchased the property for a sum significantly less than what had been previously
offered. As a result of SJW and PCDC's actions, Palmer alleges that he was prevented
from making a profit on the assembly of the land tracts for Target and that SJW and PCDC
bid up the price of the Kayser tract so as to prevent the negotiated REA from having any
value whatsoever. 

 2. The Trenton Project According to SJW and PCDC

 SJW and PCDC, on the other hand, allege that they first learned about the
development opportunities at the northeast corner of 10th Street and Trenton in 1999 or
2000, when they drove by the property and saw Schwartz's sign listing the property for
sale. After viewing Schwartz's sign listing the property for sale, SJW and PCDC made
several inquires and offers to purchase the land. In particular, SJW and PCDC obtained
a letter of intent from Dr. Kilgore regarding the sale of his land to SJW and PCDC. SJW
and PCDC then began to assemble the properties on their own for future sale to Target. 
SJW and PCDC argue on appeal that PCDC was never a party to any of the transactions
in question and that, because the record does not contain a writing evidencing a brokerage
agreement between SJW and Palmer similar to the Jackson Palmer Crossing
development, neither SJW nor PCDC were Palmer's broker for Palmer's Trenton Project. 
Instead, SJW and PCDC recalled that they competed with Palmer in developing the
northeast corner of 10th Street and Trenton. However, the record reflects that Trozzo, Jay
Williams, and Stanley failed to explicitly tell Palmer that neither SJW nor PCDC were
Palmer's broker in the development of Palmer's Trenton Project. SJW and PCDC also
allege that the earnest money contracts Palmer had with the landowners were null and void
because Palmer failed to deposit earnest money with the title company. (12) Moreover, SJW
and PCDC argued at trial that because the record did not contain a copy of all the
contracts Palmer had with the landowners, Palmer could not recover any damages on the
contracts not admitted into evidence. Furthermore, throughout the course of this case,
SJW and PCDC have denied any wrongdoing regarding the Trenton Project and attributed
Opal Baldwin's and Harlon and Mary Robinsons' termination of their contracts with Palmer
to coincidence. 

II. Procedural History

 On December 2, 2003, SJW filed its original petition against SPP, Jackson, PE, and
Palmer, individually, (collectively the "Palmer companies") alleging a breach of contract
action for commissions owed under the "Listing Agreement" pertaining to properties located
at Jackson Palmer Crossing. In this filing, SJW argued that Jackson and PE were both
assigns of SPP and that Palmer was the owner of all of the entities and, therefore, liability
was attributable to all of the named entities. On February 9, 2004, the Palmer companies
filed an original answer and counterclaim: (1) denying the allegations made by SJW in its
original petition; (2) asserting various affirmative defenses, including that Jackson, PE, and
Palmer were not liable in the capacity in which they were sued; and (3) asserting
counterclaims for breach of fiduciary duty, malicious tortious interference with contract and
prospective business relations, and fraud against SJW pertaining to an implied agency
relationship regarding transactions at the Trenton Project. 

 SJW filed its first amended petition on May 13, 2004, asserting the same causes
of action as contained in its original petition and adding an additional common-law fraud
cause of action against Palmer, individually. Subsequently, on November 8, 2005, the
Palmer companies filed their first amended answer and counterclaim: (1) generally
denying the allegations contained in SJW's first amended petition; (2) asserting various
affirmative defenses, including laches; (3) arguing, by verified plea, that Jackson was not
liable in the capacity it was sued; (4) requesting attorney's fees pursuant to article 6.04 of
the Listing Agreement; (13) (5) invoking the statutory damage caps enumerated in chapter 41
of the civil practice and remedies code; (6) re-asserting their breach of fiduciary duty,
tortious interference with contract and prospective business relations, and fraud causes
of action and noting that SJW owed Palmer "fiduciary duties of loyalty, good faith, integrity
of the strictest kind, fair and honest dealing, and the duty not to advance self-interest"; (7)
substituting Palmer as "Counter-Plaintiff"; and (8) requesting exemplary damages.

 On June 23, 2006, the Palmer companies filed a second amended answer and
counterclaim, adding PCDC as a third-party defendant and asserting an additional
counterclaim against both SJW and PCDC for negligent misrepresentation. On September
11, 2006, the Palmer companies filed their third amended answer and counterclaims,
arguing that: (1) because the Listing Agreement failed to identify the property with
sufficient certainty, the Listing Agreement does not sufficiently establish that SJW and
PCDC were owed commissions; and (2) because SJW and PCDC breached its duties of
loyalty and good faith owed to the Palmer companies, SJW and PCDC's claims were
barred. 

 SJW filed its second amended petition on September 15, 2006: (1) re-asserting its
breach of contract and common-law fraud causes of action against the Palmer companies;
(2) alleging that the actions of the Palmer companies amounted to civil conspiracy; and (3)
requesting exemplary damages. Also on September 15, 2006, SJW and PCDC filed
separate original answers: (1) denying the assertions contained in the Palmer companies'
pleadings; (2) asserting various affirmative defenses, including limitations; and (3)
requesting attorney's fees pursuant to article 6.04 of the Listing Agreement. 

 Later, on November 28, 2006, SJW filed its third amended petition, adding a
statutory fraud cause of action against the Palmer companies. On February 13, 2007, the
Palmer companies filed their fourth amended answer and counterclaims, which mirrored
their third amended answer and counterclaims and also specifically denied that SJW was
entitled to commissions related to the lease to Factory 2-U. SJW and PCDC filed a second
amended original answer on April 10, 2007.

 On April 16, 2007, the trial on this matter commenced. After SJW and PCDC rested
their case-in-chief, the trial court granted a directed verdict as to SJW and PCDC's
common-law fraud claim, leaving only SJW and PCDC's breach of contract claim and the
Palmer companies' counterclaims to be determined by the jury. (14) After several days of
testimony and the admission of hundreds of exhibits, the jury entered a mixed verdict. In
particular, the jury concluded the following:

 THE COURT: The first--Question No. 1: Did the following agree to
pay SJW Property Commerce, Inc. a commission to
[the] Staples lease? Southwest Pinnacle [Properties],
Inc., yes; Palmer Enterprises, Inc., yes.


 Question No. 2: Did the following agree to pay
SJW Property Commerce, Inc. a commission to [the]
Fashion Bug lease? A. Southwest Pinnacle Properties,
yes; Jackson I Corp., yes.

 

 [Question No. 3:] Did Southwest Pinnacle
Properties agree to pay SJW Property Commerce, Inc.
a commission on Factory 2-U lease? Answer: No.

 

 Did the following fail--Question No. 4: Did the
following fail to comply with their agreement regarding
the commission to Staples lease Southwest Pinnacle
Properties? Answer: Yes. Palmer [Enterprises], Inc.,
yes.

 

 Question No. 5: Did the following fail to comply
with [the] agreement regarding commission on the
Fashion Bug Lease? Southwest Pinnacle Properties,
yes; Jackson I Corp., yes.

 

 Was--Question No. 7: Was Southwest Pinnacle
Properties, Inc.'s failure to comply excused? Answer: 
No.

 

 Question No. 8: Was Palmer Enterprise[s], Inc.'s
failure to comply excused? Answer to the Question No.
8: No.

 

 Was--Question No. 9: Was Jackson I Corp.'s
failure to comply excused? Answer: No.

 

 Was G.J. Palmer's failure to comply
excused--Question No. 10. Answer: No.

 

 What sum of money if paid--if any, if paid now in
cash would fairly and reasonably compensate SJW
Property Commerce for damages, if any, that were
proximately caused by such conduct? Past commission
owed to Staples lease, $128,903.72; commission owed
to Fashion Bug lease, $38,400.

 

 Question No. 12: Did a relationship of trust and confidence exist between Southwest--SJW Property
Commerce, Inc. and G.J. Palmer as to North 10th &
Trenton? Answer: Yes.

 

 Question No. 13: Did [SJW] Property
Commerce, Inc. comply with its fiduciary duty to G.J.
Palmer, Jr.? Answer: No.

 

 [Question No. 14:] Did [SJW] Property
Commerce, Inc. intentionally interfere with G.J.
Palmer's earnest money contracts, if any? A. [W]ith
Opal Baldwin, yes; B. [W]ith B.W.--B.R. Whisenant,
yes; C. [W]ith Wayne Allen and [Gelee] Robinson
Allen, yes; D. [W]ith Yvonne Robinson, yes; E. [W]ith
Harlon and Mary Robinson, yes; and F. [W]ith Eugene
Kayser[, yes].

 

 Question No. 15: Did [SJW] Property
[Commerce] interfere because it has a good-faith belief
it has a right to do so? A. [N]o; B. [N]o; C. [N]o; D. 
[N]o; E. [N]o; F. [N]o.

 . . . .

 [Question No. 18:] What date should G. Palmer
in the exercise of reasonable diligence have discovered
the interference of the contracts of SJW Property
Commerce? Answer with was [sic] a date in the back. 
August 8th, 2000.

 

 Question No. 19: Did [SJW] Property
Commerce, Inc. commit fraud against G.J. Palmer, Jr.? 
Answer: Yes.

 

 . . . . 

 

 Twenty-one: By what date should G. Palmer in
[the] exercise of reasonable diligence have discovered
the fraud of [SJW] Property Commerce, Inc.? Answer: 
September 8, 2000.

 

 [Question No. 22:] What sum of money, if paid
now in cash, would fairly and reasonably compensate
G.J. Palmer, Jr. for his damages, if any, that were
proximately caused [by SJW Property Commerce's]
conduct? A. The lost profit from the Robinson tract
deal, answer $376,397. B. [L]ost profits from the rental
revenue delay $207,926. And lost profit from the
property sale delay $125,264.[ (15)]

 

 Question No. 23: Do you find by clear and
convincing evidence that the harm to G.J. Palmer, Jr.
resulted from malice [regarding PCDC's purported
actions]? Answer: Yes.

 

 [Question No. 24:] What sum of money, if paid
now in cash, would--should be assessed against
Property Commerce Development [PCDC] and awarded
to G.J. Palmer as exemplary damages, if any, for the
conduct found in response to a Question No. [2]3? And
it's $376,397.

 

 Question No. 25: Do you find by . . . clear and
convincing evidence that the harm to G.J. Palmer, Jr.
resulted from malice [regarding SJW's purported
actions]? Answer: Yes.

 

 Number 26: What sum of money, if any, if paid
now in cash should be assessed against [SJW]
Property Commerce, Inc. and awarded to G.J. Palmer,
Jr. as exemplary damages, if any . . . . Answer: $2
million dollars.


 At the conclusion of the trial, the parties filed various post-judgment motions,
including motions to disregard various portions of the jury's verdict and a motion for
judgment notwithstanding the jury's verdict. (16) The trial court entered its final judgment
adopting the jury's verdict on February 7, 2008. (17) On March 6, 2008, SJW filed a motion
for new trial, a motion to modify the judgment, and a motion for remittitur, asserting, among
other things, that: (1) the evidence supporting the damages awarded to Palmer was
insufficient; (2) the amount of attorney's fees awarded to Palmer's attorneys required
modification; and (3) limitations barred all claims brought by the Palmer companies. In
response to SJW's March 6, 2008 motions, the Palmer companies filed their own motion
for new trial, arguing that the evidence supporting the jury's verdict as to the commissions
owed to SJW was insufficient. SJW's March 6, 2008 motions and the Palmer companies'
motion for new trial were overruled by operation of law. See Tex. R. Civ. P. 329b(c). SJW
and PCDC filed a notice of appeal, and the Palmer companies responded by filing a notice
of cross-appeal. 

III. Standing and Tolling of the Limitations Period

 In their first issue, SJW and PCDC assert that SPP did not have standing to assert
its February 9, 2004 counterclaims against SJW and PCDC because SPP "was not
damaged with respect to any actions at 10th Street and Trenton Road." SJW and PCDC
further assert that even if SPP did have standing, its causes of action do not constitute a
counterclaim and are, instead, a third-party action that is barred by limitations. SJW and
PCDC also argue that SPP's counterclaim did not arise out of SJW's claim for
commissions. The Palmer companies counter by arguing that SPP had standing to sue
and that limitations did not bar the Palmer companies' counterclaims because SPP was
an aggrieved party and the Palmer companies' counterclaims were brought in accordance
with sections 16.068 and 16.069 of the civil practice and remedies code. See Tex. Civ.
Prac. & Rem. Code Ann. §§ 16.068, 16.069 (Vernon 2008). 

A. Applicable Law

 1. Standing and Capacity

 A plaintiff must have both standing and capacity to bring a lawsuit. Austin Nursing
Ctr., Inc. v. Lovato, 171 S.W.3d 845, 848 (Tex. 2005) (citing Coastal Liquids Transp., L.P.
v. Harris County Appraisal Dist., 46 S.W.3d 880, 884 (Tex. 2001)). The standing inquiry
"focuses on whether a party has a sufficient relationship with the lawsuit so as to have a
'justiciable interest' in its outcome, whereas the issue of capacity 'is conceived of as a
procedural issue dealing with the personal qualifications of a party to litigate.'" Id. (quoting
6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and
Procedure: Civil 2D § 1559, at 441 (2d ed. 1990)). A plaintiff has standing when he is
personally aggrieved, regardless of whether he is acting with legal authority; a party has
capacity when it has the legal authority to act, regardless of whether it has a justiciable
interest in the controversy. See Nootsie, Ltd. v. Williamson County Appraisal Dist., 925
S.W.2d 659, 661 (Tex. 1996) (holding that the standing doctrine requires that there be (1)
"a real controversy between the parties," that (2) "will be actually determined by the judicial
declaration sought"). The complained-of injury "must be concrete and particularized, actual
or imminent, not hypothetical." DaimlerChrysler Corp. v. Inman, 252 S.W.3d 299, 304-05
(Tex. 2008) (footnotes omitted); see Tex. Lottery Comm'n v. Sci. Games Int'l, 99 S.W.3d
376, 380 (Tex. App.-Austin 2003, pet. denied) (holding that "[t]o establish standing, one
must show a justiciable interest by alleging an actual or imminent threat of injury peculiar
to one's circumstances and not suffered by the public generally"); see also Elizondo v. Tex.
Natural Res. Conservation Comm'n, 974 S.W.2d 928, 932 (Tex. App.-Austin 1998, no
pet.) (citing Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (noting that the general standard
for determining whether plaintiff has standing is whether she has such a personal stake in
the outcome of the controversy as to warrant invocation of the court's jurisdiction and to
justify exercise of the court's remedial powers on her behalf)). Furthermore, standing is
implicit in subject-matter jurisdiction and cannot be waived. See Lovato, 171 S.W.3d at
849; see also Tex. Ass'n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 443 (Tex. 1993).

B. Discussion

 1. SPP's Standing to Bring Its February 9, 2004 Counterclaims

 On appeal, SJW and PCDC first argue that there is no evidence in the record
demonstrating that SPP was involved in any negotiations for the purchase of property at
the northeast corner of 10th Street and Trenton Road; therefore, because the Palmer
companies' counterclaims centered on SJW and PCDC's purported conduct regarding
Palmer's Trenton Project, SPP did not have a justiciable interest in the matters asserted
in the Palmer companies' counterclaims. The Palmer companies counter by arguing that
they timely filed their counterclaims and that sections 16.068 and 16.069 of the civil
practice and remedies code allowed for the substitution of Palmer as the aggrieved party
in place of SPP. See Tex. Civ. Prac. & Rem. Code Ann. §§ 16.068, 16.069. Moreover, the
Palmer companies construe SJW and PCDC's standing argument as a capacity issue that
was waived by SJW and PCDC's failure to file a verified plea. See Tex. R. Civ. P. 93.

 As mentioned earlier, SJW filed its original petition against the Palmer companies
on December 2, 2003. Subsequently, on February 9, 2004, the Palmer companies filed
their original answer and counterclaims against SJW. However, the Palmer companies
identified SPP as the sole "Counter-Plaintiff" in their original counterclaims. In their first
amended counterclaims filed on November 8, 2005, the Palmer companies amended their
counterclaims to replace SPP with Palmer as "Counter-Plaintiff." No new causes of action
were asserted in the Palmer companies' November 8, 2005 amended counterclaims. 

 SJW and PCDC correctly state that SPP was not involved in any negotiations
regarding the development of Palmer's Trenton Project, which is the basis of the Palmer
companies' counterclaims. SJW and PCDC argue that SPP was a proper party to the
Jackson Palmer Crossing dispute but not to the Trenton Project dispute. However, after
viewing the entire record, we find that the claims at issue in this case are inextricably
intertwined so as to constitute the same transaction or occurrence. See id. at R. 97(a). 
Thus, even though the Palmer companies first named SPP as the "Counter-Plaintiff" in
their counterclaims, we find that SPP had a justiciable interest in this matter and, therefore,
had standing. 

 In arriving at our conclusion, we first determine what constitutes a "transaction." To
determine whether a set of facts constitutes a "transaction," we employ the logical
relationship test, which examines whether the essential facts on which the claims are
based are significantly and logically relevant to both claims. Wells v. Dotson, 261 S.W.3d
275, 281 (Tex. App.-Tyler 2008, no pet.) (citing Cmty. State Bank v. NSW Invs., 38 S.W.3d
256, 258 (Tex. App.-Texarkana 2001, pet. dism'd w.o.j.) (considering the term
"transaction" in determining whether a counterclaim was compulsory)); see Smith v.
Ferguson, 160 S.W.3d 115, 120 (Tex. App.-Dallas 2005, pet. denied). "Under this test,
a transaction is flexible, comprehending a series of many occurrences logically related to
one another." Wells, 261 S.W.3d at 281 (citing NSW Invs., 38 S.W.3d at 258; Klein v.
Dooley, 933 S.W.2d 255, 259 (Tex. App.-Houston [14th Dist.] 1996), rev'd on other
grounds, 949 S.W.2d 307 (Tex. 1997)). "There is no logical relationship when none of the
same facts are relevant to both claims. However, whenever the same facts, which may or
may not be disputed, are significant and logically relevant to both claims, the 'logical
relationship' test is satisfied." Jack H. Brown & Co. v. Nw. Sign Co., 718 S.W.2d 397, 400
(Tex. App.-Dallas 1986, writ ref'd n.r.e.).

 Here, Palmer testified that the alleged brokerage relationship between himself and
SJW at the Trenton Project arose as a result of their dealings at the Jackson Palmer
Crossing shopping center, where SPP was a signatory to the Listing Agreement. Several
witnesses testified that SJW acted as Palmer's broker at both the Jackson Palmer
Crossing project and the Trenton Project. Furthermore, even SJW admits that it and
Palmer engaged in numerous conversations regarding the development of both sites at
around the same point in time. Finally, we find it particularly noteworthy that Jay Williams
informed Trammell Crow, Palmer's one-time broker, that "if . . . Palmer pays to [SJW]
Property Commerce commissions allegedly owed to them for two (2) deals that were
completed at Jackson Palmer Crossing," SJW and PCDC would "assign [Dr. Kilgore's]
contract to [Palmer]." As noted earlier, Dr. Kilgore's contract exclusively involved Palmer's
Trenton Project. Therefore, the statement made by Jay Williams to Trammell Crow
indicates that SJW and PCDC viewed the disputes at Jackson Palmer Crossing and at
10th Street and Trenton Road as inextricably intertwined. Because the record suggests
that the claims in dispute are logically related, we conclude that SPP had a justiciable
interest in the outcome of this matter and, thus, was aggrieved; as such, we cannot say
that SPP lacked standing to assert its February 9, 2004 counterclaims. (18)

 2. The Substitution of Palmer as "Counter-Plaintiff"

 Despite concluding that SPP had standing to assert its counterclaims, we do not
believe that SPP had the capacity to sue SJW and PCDC for damages sustained at the
Trenton Project because SPP was not a party to the negotiations pertaining to the Trenton
Project. See Nootsie, Ltd., 925 S.W.3d at 661 (defining "capacity" as the legal authority
to act, regardless of whether it has a justiciable interest in the controversy). Realizing that
SPP lacked the capacity to sue for damages associated with the Trenton Project, the
Palmer companies substituted Palmer as the proper "Counter-Plaintiff" without asserting
any new causes of action. See Carter v. DeJarnatt, 523 S.W.2d 88, 91 (Tex.
App.-Texarkana 1975, writ ref'd n.r.e.) (concluding that suit was not barred by limitations
where the amended petition, which was filed after the expiration of the limitations period,
did not change the cause of action but, rather, changed the capacity in which appellant
sued). Texas courts have recognized that a mistake in naming parties to a lawsuit, such
as here, constitutes a case of misnomer. 

 "Misnomer cases are analyzed by asking the following questions: (1) Would a
judgment under the original pleading bar recovery under the amended pleading? (2) Would
the same evidence support both of the pleadings? (3) Is the measure of damages the
same in both pleadings? (4) Are the allegations of each pleading subject to the same
defenses?" Foust v. Estate of Walters, 21 S.W.3d 495, 501 (Tex. App.-San Antonio 2000,
pet. denied) (citing Phoenix Lumber Co. v. Houston Water Co., 94 Tex. 456, 61 S.W. 707,
709 (1901)). "When a party is misnamed, but no one has been misled or disadvantaged
by the error in pleading, the relation-back doctrine operates to preserve the claim against
a bar of limitations." Id. (citing Dougherty v. Gifford, 826 S.W.2d 668, 677 (Tex.
App.-Texarkana 1992, no writ); Palmer v. Enserch Corp., 728 S.W.2d 431, 434 (Tex.
App.-Austin 1987, writ ref'd n.r.e.)). "If the nature of the suit against the defendants
remains unchanged, the substitution of parties-plaintiff does not constitute a new suit." Id.
(citing Vaughn Bldg. Corp. v. Austin Co., 620 S.W.2d 678, 682 (Tex. Civ. App.-Dallas
1981), aff'd, 643 S.W.2d 113 (Tex. 1982); Medford v. Red River County, 84 S.W.2d 345,
352 (Tex. Civ. App.-El Paso 1935, no writ)). In other words, so long as the purpose and
the nature of the claim asserted are clear from the outset, the substitution of a personal
representative for a party without capacity does not introduce a new or different cause of
action, and the substitution should satisfy the relation-back doctrine. See Lovato, 171
S.W.3d at 852-53; see also Lorentz v. Dunn, 171 S.W.3d 854, 856 (Tex. 2005). In the present case, the record demonstrates that Palmer is the president and,
therefore, personal representative of SPP. Furthermore, the Palmer companies' first
amended answer and counterclaims filed on November 8, 2005, substituted Palmer
himself as the proper "Counter-Plaintiff" and advanced the same causes of action against
SJW as contained in the Palmer companies' original counterclaims. Neither SJW nor
PCDC objected to Palmer's substitution as "Counter-Plaintiff." Moreover, neither SJW nor
PCDC demonstrated to the trial court that they were prejudiced or disadvantaged by
Palmer's substitution as "Counter-Plaintiff." It is clear to us that Palmer was substituted in
place of SPP because SPP lacked the capacity to sue for damages pertaining to the
Trenton Project. Based on the record before us, we cannot say that the substitution of
Palmer as "Counter-Plaintiff" amounted to a new suit or was improper.

 3. The Relation-Back Doctrine and Limitations

 Given that we have concluded that Palmer was the proper party to bring suit against
SJW for the purported conduct that transpired at the Trenton Project, we must now
determine whether the Palmer companies' counterclaims were barred by limitations or
whether the limitations period was tolled by sections 16.068 and 16.069 of the civil practice
and remedies code, as alleged by the Palmer companies on appeal. See Tex. Civ. Prac.
& Rem. Code Ann. §§ 16.068, 16.069. The Palmer companies alleged that SJW: (1)
tortiously interfered with Palmer's earnest money contracts; (2) tortiously interfered with
Palmer's prospective business relations with the landowners; (3) breached its fiduciary duty
owed to Palmer; and (4) committed fraud. On appeal, SJW and PCDC argue that the
Palmer companies' counterclaims were time-barred. SJW and PCDC further argue that
the Palmer companies' counterclaims were really third-party actions; thus, section 16.069
of the civil practice and remedies code did not serve to toll the limitations period. 

 The limitations period for breach of fiduciary duty and fraud is four years. See Tex.
Civ. Prac. & Rem. Code Ann. § 16.004(a)(4)-(5) (Vernon 2002); see also Willis v. Donnelly,
199 S.W.3d 262, 278 n.33 (Tex. 2006); Exxon Corp. v. Emerald Oil & Gas Co., No. 05-1076, 2009 Tex. LEXIS 113, at *22 (Tex. Mar. 27, 2009) (citing Little v. Smith, 943 S.W.2d
414, 420 (Tex. 1997)). In question number 21, the jury, after considering all the evidence
adduced at trial, concluded that Palmer should have discovered the alleged fraud
perpetrated by SJW on September 8, 2000; therefore, the statute of limitations for the
Palmer companies' breach of fiduciary duty and fraud causes of action began to run from
that date. See Emerald Oil & Gas Co., 2009 Tex. LEXIS 113, at *22 (citing Little, 943
S.W.2d at 420) (holding that the limitations period for fraud begins to run from the time the
party knew of the misrepresentation). The Palmer companies first asserted their breach
of fiduciary duty and fraud causes of action as to SJW in their original counterclaims filed
on February 9, 2004, which was more than six months before the four-year limitations
period expired. Thus, the Palmer companies' breach of fiduciary duty and fraud causes
of action were timely filed by SPP against SJW. However, in asserting these causes of
action, the Palmer companies designated SPP as "Counter-Plaintiff," and we have already
concluded that SPP lacked the capacity to bring these causes of action. The substitution
of Palmer as "Counter-Plaintiff" did not transpire until November 8, 2005, which was more
than one year after the four-year limitations period expired. Absent any tolling of the
limitations period, the Palmer companies' breach of fiduciary duty and fraud claims would
be time-barred. 

 However, the Palmer companies argue that the relation-back doctrine tolls the
applicable limitations period. Under the relation-back doctrine, as outlined by section
16.068 of the civil practice and remedies code,

 if a filed pleading relates to a cause of action, cross action, counterclaim, or
defense that is not subject to a plea of limitation when the pleading is filed,
a subsequent amendment or supplement to the pleading that changes the
facts or grounds of liability or defense is not subject to a plea of limitation
unless the amendment or supplement is wholly based on a new, distinct, or
different transaction or occurrence.


Tex. Civ. Prac. & Rem. Code Ann. § 16.068; see Brewster v. Columbia Med. Ctr. of
McKinney Subsidiary, L.P., 269 S.W.3d 314, 317 (Tex. App.-Dallas 2008, no pet.). 
Section 16.068 is a tolling statute that stops the clock at the time that the original petition
is filed, if filed within the limitations period, but cannot toll a time period already expired. 
See Almazan v. United Servs. Auto Ass'n, 840 S.W.2d 776, 779 (Tex. App.-San Antonio
1992, writ denied). This section is designed to protect litigants from loss of their claims by
a plea of limitations in cases where that would otherwise occur and, therefore, should be
liberally construed. Milestone Props., Inc. v. Federated Metals Corp., 867 S.W.2d 113, 116
(Tex. App.-Austin 1993, no writ). "The relation-back doctrine originated as an equitable
remedy designed to effectuate justice." Lovato v. Austin Nursing Ctr., Inc., 113 S.W.3d 45,
55 (Tex. App.-Austin 2003), aff'd, 171 S.W.3d 845 (citing Cain v. State, 882 S.W.2d 515,
518 (Tex. App.-Austin 1994, no writ)). "'It enables the court to arrive at conclusions that
will effectuate justice while maintaining simultaneously the appearance of logical
consistency.'" Id. (quoting Cain, 882 S.W.2d at 518).

 "The relation-back doctrine has been applied to cure capacity issues, but it cannot
retroactively create personal jurisdiction." Armes v. Thompson, 222 S.W.3d 79, 84 (Tex.
App.-Eastland 2006, no pet.). For example, the Texas Supreme Court has allowed the
alleged personal representative in probate cases to obtain the probate court's permission
to represent the estate after litigation had been filed on behalf of the estate. See Lovato,
171 S.W.3d at 853-56; see also Lorentz, 171 S.W.3d at 856. However, this does not mean
"that subsequent pleadings can give the trial court jurisdiction over new parties retroactive
to the original filing of the suit." Armes, 222 S.W.3d at 84 (citing Covington v. Sisters of
Charity of the Incarnate Word, 179 S.W.3d 583, 587-88 (Tex. App.-Amarillo 2005, pet.
denied)).

 Essentially, the relation-back doctrine allows for a party to amend or supplement a
pleading changing facts or grounds of liability or even to correct capacity issues, as long
as the original claims were timely filed and the amendments or supplementation are not
based on a "new, distinct, or different transaction or occurrence." See Tex. Civ. Prac. &
Rem. Code Ann. § 16.068; see also Armes, 222 S.W.3d at 84. Here, we have already
concluded that: (1) the Palmer companies' breach of fiduciary duty and fraud claims were
timely filed by SPP against SJW; (2) SPP had standing to file suit against SJW for the
purported actions occurring during the development of the Trenton Project; and (3) the
disputes at the Jackson Palmer Crossing shopping center and the Trenton Project were
logically related so as to constitute the same transaction or occurrence. Therefore, in
applying the relation-back doctrine, we conclude that the Palmer companies' substitution
of Palmer as "Counter-Plaintiff," though subject to a plea of limitation on its own, relates
back to the original, timely-filed breach of fiduciary duty and fraud counterclaims brought
by SPP against SJW. See Tex. Civ. Prac. & Rem. Code Ann. § 16.068; see also Armes,
222 S.W.3d at 84. The Palmer companies were allowed to cure capacity issues in their
first amended counterclaims without losing their counterclaims to a plea of limitations. See
Armes, 222 S.W.3d at 84; Milestone Props., Inc., 867 S.W.2d at 116; see also Lovato, 113
S.W.3d at 55. Thus, we hold that the Palmer companies' breach of fiduciary duty and
fraud counterclaims were timely filed. (19) 

 With regard to SJW and PCDC's argument that the Palmer companies'
counterclaims were really third-party actions, SJW and PCDC do not cite to any authority
supporting their contention. However, in reviewing rules 38 and 97 of the rules of civil
procedure, we conclude that the Palmer companies' claims against SJW are not third-party
actions but, rather, constitute counterclaims. See Tex. R. Civ. P. 38, 97. Rule 38, entitled
"Third-Party Practice," states that: 

 At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a citation and petition to be served upon a person
not a party to the action who is or may be liable to him or to the plaintiff for
all or part of the plaintiff's claim against him.

Id. at R. 38. On the other hand, rule 97(b) provides that: "A pleading may state as a
counterclaim any claim against an opposing party whether or not arising out of the
transaction or occurrence that is the subject matter of the opposing party's claim." Id. at
R. 97(b).

 In the instant case, SJW filed suit against the Palmer companies, including SPP and
Palmer, individually. The Palmer companies' February 9, 2004 counterclaims did not
assert causes of action against "a person not a party to the action who is or may be liable
to him or to the plaintiff for all or part of the plaintiff's claim against him." See id. at R. 38. 
Instead, the Palmer companies' February 9, 2004 counterclaims state claims that, as we
have already concluded, arise out of the same transaction or occurrence as SJW's dispute
involving commissions at the Jackson Palmer Crossing shopping center and were against
the opposing party--SJW. See id. at R. 97(b); CDB Software, Inc. v. Kroll, 982 S.W.2d
629, 632 (Tex. App.-Houston [1st Dist.] 1998, no pet.); Latham v. Allison, 560 S.W.2d 481,
485 (Tex. App.-Fort Worth 1977, writ ref'd n.r.e.) (defining a counterclaim as "a claim,
which, if established will defeat or in some way qualify a judgment to which the plaintiff is
otherwise entitled. It embraces both setoff and recoupment, and also comprehends
reconvention as well as all adversary actions by the defendant in a case"); see also
Black's Law Dictionary 402 (9th ed. 2009) (defining a counterclaim as "[a] claim for relief
asserted against an opposing party after an original claim has been made"). We therefore
conclude that the Palmer companies' claims against SJW constituted counterclaims and,
thus, fell within the scope of section 16.068 of the civil practice and remedies code. See
Tex. Civ. Prac. & Rem. Code Ann. § 16.068; see also Tex. R. Civ. P. 97(b).

 4. The Palmer Companies' Claims Against PCDC

 Regarding PCDC's inclusion in this dispute, SJW and PCDC argue that because
PCDC was not added to the lawsuit until June 23, 2006, the Palmer companies' claims
against PCDC are barred by limitations. SJW and PCDC further argue that the Palmer
companies' claims against PCDC constitute a third-party action rather than a counterclaim;
thus, the tolling of the limitations period under sections 16.068 and 16.069 is not allowed
for the third-party action. (20) The Palmer companies contend that: (1) PCDC had fair notice
of the Palmer companies' claims, and, thus, PCDC could not have been prejudiced by its
inclusion in the lawsuit; and (2) the evidence suggests that SJW and PCDC "are closely
related, if not identical" and that the claims alleged against PCDC arose out of the same
transaction or occurrence as the Palmer companies' claims against SJW. (21)

 PCDC was not a party to SJW's original petition and was joined to the lawsuit when
the Palmer companies filed their second amended answer and counterclaims on June 23,
2006, approximately six years after the causes of action contained in the Palmer
companies' counterclaims accrued. Therefore, absent any tolling of the limitations period,
the Palmer companies' claims against PCDC were untimely. Because PCDC was first
joined as a party to the action by the Palmer companies on June 23, 2006, Texas Rule of
Civil Procedure 38 dictates a finding that the Palmer companies' claims against PCDC
constituted a third-party action. See Tex. R. Civ. P. 38. Therefore, because the Palmer
companies claims against PCDC were actually third-party actions rather than
counterclaims or cross claims, we conclude that the claims against PCDC were not tolled
by either section 16.068 or section 16.069 of the civil practice and remedies code and
were, thus, time-barred. See Tex. Civ. Prac. & Rem. Code Ann. §§ 16.068, 16.069; see
also J.M.K. 6, Inc. v. Gregg & Gregg, P.C., 192 S.W.3d 189, 199-202 (Tex. App.-Houston
[14th Dist.] 2006, no pet.) (holding that third-party actions are not contemplated by the
terms "counterclaim or cross claim" contained in section 16.069 of the civil practice and
remedies code and that "the purpose of section 16.069 would not be served by rewriting
it to allow a defendant to revive an expired claim against a non-party"). 

 In sum, we hold that: (1) the Jackson Palmer Crossing dispute and the Trenton
Project dispute are inextricably intertwined and, thus, constitute a single transaction or
occurrence; (2) SPP had standing to file its February 9, 2004 counterclaims against SJW;
(3) Palmer was properly substituted as "Counter-Plaintiff" in the Palmer companies' first
amended answer and counterclaims; (4) the Palmer companies' claims against SJW
constituted counterclaims; (5) the Palmer companies' counterclaims against SJW for fraud
and breach of fiduciary duty were tolled by section 16.068 of the civil practice and remedies
code and relate back to the Palmer companies' timely-filed February 9, 2004
counterclaims; and (6) the Palmer companies' claims against PCDC constituted third-party
actions, which did not toll the applicable limitations periods. Accordingly, we overrule SJW
and PCDC's first issue, in part, and sustain it, in part. 

IV. Sufficiency of the Evidence that SJW Intentionally Interfered With Palmer's
Earnest Money Contracts (22)


 By their second issue, SJW argues that the evidence supporting the jury's verdict
that it intentionally interfered with Palmer's earnest money contracts is insufficient. 
However, SJW does not complain about the jury's findings as to the Palmer companies'
breach of fiduciary duty and fraud claims. Texas courts have held that SJW's failure to
attack all independent grounds supporting a judgment requires us to affirm the trial court's
judgment. See Britton v. Tex. Dep't of Crim. Justice, 95 S.W.3d 676, 681 (Tex.
App.-Houston [1st Dist.] 2002, no pet.); Oliphant Fin. LLC v. Angiano, 295 S.W.3d 422,
423 (Tex. App.-Dallas 2009, no pet.) ("If an independent ground fully supports the
complained-of ruling or judgment, but the appellant assigns no error to that independent
ground, we must accept the validity of that unchallenged independent ground, and thus any
error in the grounds challenged on appeal is harmless because the unchallenged
independent ground fully supports the complained-of ruling or judgment."); see also Kelly
v. Klein, 827 S.W.2d 609, 611 (Tex. App.-Houston [14th Dist.] 1992, no writ) (citing
Midway Nat'l Bank of Grand Prairie, Tex. v. W. Tex. Wholesale Supply Co., 453 S.W.2d
460, 461 (Tex. 1970); Tex. Dep't of Human Res. v. Orr, 730 S.W.2d 435, 436 (Tex.
App.-Austin 1987, no writ)). 

 Neither party has argued on appeal that the jury's damages awards cannot be
supported by either of the fraud or breach of fiduciary duty findings, and it is clear to this
Court that the jury's damages award can be supported by either of the jury's liability
findings. See Tex. Civ. Prac. & Rem. Code Ann. § 41.002 (Vernon 2008) (providing that
chapter 41 of the civil practice and remedies code--the exemplary damages
chapter--"applies to any action in which a claimant seeks damages relating to a cause of
action"). Therefore, because the jury concluded that SJW committed fraud and breached
a fiduciary duty owed to the Palmer companies, and because SJW does not attack those
causes of action on appeal, we need not analyze SJW's sufficiency challenge as to the
Palmer companies' tortious interference with contract claims. See Britton, 95 S.W.3d at
681; see also Angiano, 295 S.W.3d at 423; Kelly, 827 S.W.2d at 609. Thus, we affirm the
jury's findings as to SJW's liability. See Britton, 95 S.W.3d at 681; see also Angiano, 295
S.W.3d at 423; Kelly, 827 S.W.2d at 609. Accordingly, we overrule SJW's second issue
on appeal. V. The Damage Award

 By its third issue, SJW argues that the jury's damage awards are not supported by
legally and factually sufficient evidence. In particular, SJW challenges: (1) the damage
calculations made by Palmer's expert, Abington, as speculative; and (2) the jury's finding
that SJW acted with malice in allegedly intentionally interfering with Palmer's earnest
money contracts. The Palmer companies contend that the jury's damage awards are
supported by legally and factually sufficient evidence. The Palmer companies highlight the
fact that SJW did not object to Abington's damages model and testimony at trial. 
Furthermore, the Palmer companies argue that the punitive damages cap does not apply,
and the jury was not required to find that a vice-principal of SJW intentionally interfered
with Palmer's earnest money contracts in order to sustain the punitive damage awards.

A. The Jury's Award of Actual Damages to the Palmer Companies

 1. Standard of Review and Applicable Law

 On appeal, SJW challenges the legal and factual sufficiency of the jury's actual
damages award. We must sustain a challenge to a jury finding based on legal sufficiency
only when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the
court is barred by rule of law or of evidence from giving weight to the only evidence offered
to prove a vital fact; (3) the evidence provided to prove a vital fact is no more than a mere
scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. City of
Keller v. Wilson, 168 S.W.3d 802, 810-11 (Tex. 2005). "[W]hen the evidence offered to
prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of
its existence, the evidence is less than a scintilla and, in legal effect, is no evidence." Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004). More than a scintilla of evidence
exists if the evidence rises to a level that would enable reasonable and fair-minded people
to differ in their conclusions. Id.

 In our legal sufficiency review, we review the evidence in the light most favorable
to the finding, crediting favorable evidence if a reasonable fact-finder could and
disregarding contrary evidence unless a reasonable fact-finder could not. City of Keller,
168 S.W.3d at 807. The final test for legal sufficiency is whether the evidence presented
at trial would enable reasonable and fair-minded people to make the finding under review. 
Id. at 827. 

 The jury is the sole judge of witnesses' credibility, and it may choose to believe one
witness over another; a reviewing court may not impose its own opinion to the contrary. 
Id. at 819. Because it is the jury's province to resolve conflicting evidence, we must
assume that jurors resolved all conflicts in accordance with their verdict if reasonable
human beings could do so. Id. 

 On the other hand, when reviewing a jury finding for factual sufficiency, we consider
and weigh all of the evidence in a neutral light and conclude that the finding is not
supported by sufficient evidence only if the finding is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175,
176 (Tex. 1986) (per curiam). If we determine that the evidence supporting the jury's
verdict is not supported by factually sufficient evidence, we must "detail the evidence
relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the
evidence in support of the verdict." Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex.
2001) (per curiam).

 We do note that actual damages are a prerequisite to an exemplary damage award. 
See Tex. Civ. Prac. & Rem. Code Ann. § 41.004(a) (Vernon 2008); see also Wright v.
Gifford-Hill & Co., 725 S.W.2d 712, 713-14 (Tex. 1987); Swinnea v. ERI Consulting Eng'rs,
Inc., 236 S.W.3d 825, 842 (Tex. App.-Tyler 2007, pet. granted). Therefore, if we were to
find that the jury's actual damages award was not supported by legally and factually
sufficient evidence, then we would not need to analyze the jury's exemplary damages
award.

 When a party properly objects to a jury question, we review the sufficiency of the
evidence in the light of the charge that the trial court should have submitted. W.L.
Lindemann Operating Co. v. Strange, 256 S.W.3d 766, 775 (Tex. App.-Fort Worth 2009,
no pet.). Absent an objection to the jury charge, the sufficiency of the evidence is reviewed
in light of the charge submitted. Id. (citing Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d
711, 715 (Tex. 2001); City of Fort Worth v. Zimlich, 29 S.W.3d 62, 71 (Tex. 2000)). Here,
SJW did not object to any questions contained in the jury charge that pertained to the
calculation of damages; thus, we review the sufficiency of the damage awards in light of
the charge submitted. See id.; see also Sturges, 52 S.W.3d at 715; Zimlich, 29 S.W.3d
at 71. 

 2. Discussion

 On appeal, SJW argues that the evidence supporting the jury's actual damages
awards is insufficient because Abington's calculations are speculative in nature and,
therefore, amounted to no evidence.

 In question number 22 of the charge, the jury was asked to determine the amount
of money that would fairly and reasonably compensate Palmer for his damages, if any, that
were proximately caused by SJW's conduct. The charge did not specifically attribute this
damage question to any particular cause of action; therefore, it could have applied to the
Palmer companies' fraud, breach of fiduciary duty, or tortious interference causes of
action. (23) In any event, the jury concluded that Palmer sustained: (1) $376,397 in damages
for lost profits from the Robinson tract delay; (2) $207,926 in damages for lost profits from
the rental revenue delay on the Kayser tract; and (3) $125,264 in damages for lost profits
from the property sale delay, also on the Kayser tract. The jury's actual damages
calculation is premised on evidence submitted by the Palmer companies as to lost profits.

 "Lost profits are damages for the loss of net income to a business measured by
reasonable certainty." Miga v. Jensen, 96 S.W.3d 207, 213 (Tex. 2002); see Bossier
Chrysler Dodge II, Inc. v. Rauschenberg, 201 S.W.3d 787, 808 (Tex. App.-Waco 2006),
rev'd in part, 238 S.W.3d 376 (Tex. 2007) (per curiam). "Net profits" are defined as "what
remains in the conduct of a business after deducting from its total receipts all of the
expenses incurred in carrying on the business." Turner v. PV Int'l Corp., 765 S.W.2d 455,
465 (Tex. App.-Dallas 1988, writ denied) (citing R.A. Corbett Transp., Inc. v. Oden, 678
S.W.2d 172, 176 (Tex. App.-Tyler 1984, no writ)). "[I]n order to recover lost profits,
damages must be shown with 'reasonable certainty'[;] net profits must be shown by
objective, rather than subjective, facts, figures, and data." Turner, 765 S.W.2d at 465
(quoting Automark of Tex. v. Discount Trophies, 681 S.W.2d 828, 830 (Tex. App.-Dallas
1984, no writ)) (emphasis in original). "Recovery for lost profits does not require that the
loss be susceptible to exact calculation"; however "[a]t a minimum, opinions or lost-profit
estimates must be based on objective facts, figures, or data from which the lost-profits
amount may be ascertained." Helena Chem Co. v. Wilkins, 47 S.W.3d 486, 504 (Tex.
2001) (citing Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994); Tex.
Instruments, Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d 276, 279 (Tex. 1994); Holt
Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992)); see Sw. Battery Corp. v.
Owen, 131 Tex. 423, 115 S.W.2d 1097, 1098-1099 (1938); Orchid Software, Inc. v.
Prentice-Hall, Inc., 804 S.W.2d 208, 211 (Tex. App.-Austin 1991, writ denied). The Helena
Chemical court further noted that: 

 We have held that past profits, coupled with other facts and circumstances,
may establish a lost-profits amount with reasonable certainty. However, lack
of a profit history does not, by itself, preclude a new business from recovering
lost future profits. Rather, our focus is on whether damages can be shown
with reasonable certainty. This can be accomplished with a profit history or
some other objective data, such as future contracts, from which lost profits
can be calculated with reasonable certainty.


47 S.W.3d at 505 (citations omitted) (emphasis in original).

 The Palmer companies called Abington to testify on damages sustained as a result
of SJW's wrongful conduct. Additionally, Abington provided numerous spreadsheets, which
were admitted into evidence, to corroborate his testimony. After reviewing the evidence
contained in the record, Abington concluded that the Palmer companies sustained $709,587
in actual damages. This calculation was comprised of three figures: (1) $376,397 in lost
profits on the Robinson tract delay; (2) $207,926 in lost profits on delayed rental revenue;
and (3) $125,264 in lost profits on the delayed sale of the properties. 

 In calculating damages associated with the Robinson tract delay, Abington relied on
Palmer's earnest money contracts with Opal Baldwin, Wayne and Gelee Allen, Harlon and
Mary Robinson, Yvonne Robinson, and Whisenant and assumed that all five of the
contracts were effective on April 15, 2000, and were assigned to Target for no profit on
June 15, 2001. (24) This accounted for a fourteen-month delay. Abington then calculated a
sales price for the land to be $2,950,101, which was based on representations made by
Target as to the maximum price it would pay for the land--$4.50 per square foot for 15.05
acres. (25) Abington then subtracted the prices for which Palmer agreed to purchase the
landowners' land and closing costs, which appears to include the 6% commission fee
included in each earnest money contract. The total costs amounted to $2,573,704, and the
net profit amounted to $376,397. 

 With regard to his second calculation, Abington analyzed damages involving delayed
rental income from the Kayser tract. Regarding the delays, Abington assumed a twelve-month delay, which was less than the actual nineteen-month delay to which Palmer
testified--from the time Palmer and Kayser began negotiating, and Kayser's alleged
approval of Palmer's $1.96 million offer around July 2000 to when the property was finally
sold to Palmer in February 2002. Abington relied on a spreadsheet documenting actual
rental payments made by businesses that were situated on the Kayser tract near the time
of trial and determined that the assumed twelve-month delay due to SJW's wrongful
actions, caused Palmer to lose $3,326,823 in rental income. Abington then used a
conservative estimate of 6.25% for cost of capital and ultimately concluded that the Palmer
companies sustained $207,926 in losses of rental income associated with the Kayser tract,
after subtracting "[a]ny expenses associated with really running the property." 

 Abington's final damages calculation addressed losses sustained by the Palmer
companies as to the sale of portions of the Kayser tract to Bank of America, Jack-in-the-Box, and Logan's Roadhouse. Abington noted that: (1) Bank of America bought a portion
of the Kayser tract on June 5, 2003, for $566,636; (2) Jack-in-the-Box bought a portion of
the Kayser tract on October 15, 2004, for $566,711; and (3) Logan's Roadhouse bought
another portion of the Kayser tract on September 1, 2004, for $870,875. The sum total of
these sales amounted to $2,004,222. Abington, once again, multiplied the sales amount
by a conservative measure for cost of capital--6.25%--to arrive at his damage calculation
of $125,264. 

 Based on the damages awarded by the jury, it is clear that the jury agreed with
Abington's damages calculations. Furthermore, based on the foregoing, we conclude that
the Palmer companies' damages evidence described, with reasonable certainty, the profits
they lost; therefore, we cannot say that the jury was unreasonable in adopting Abington's
damages calculations. See City of Keller, 168 S.W.3d at 807, 810-11; see also Miga, 96
S.W.3d at 213; Helena Chem Co., 47 S.W.3d at 504-05; Rauschenberg, 201 S.W.3d at
808. Abington provided the jury with ample documentary and testimonial evidence that was
objective in nature and allowed the jury to determine the proper amount of actual damages
to award. Helena Chem Co., 47 S.W.3d at 504; Szczepanik, 883 S.W.2d at 649; Teletron
Energy Mgmt., Inc., 877 S.W.2d at 279; Heine, 835 S.W.2d at 84; see Orchid Software,
Inc., 804 S.W.2d at 211. Moreover, SJW did not offer any evidence contradicting
Abington's calculations, nor did it object to the admission of Abington's testimony or exhibits
relating to damages. 

 We note that in virtually all damages calculations, there is some degree of
subjectivity involved, especially when forecasting future profits and losses. However, we
do not believe that the evidence submitted by the Palmer companies as to actual damages
was speculative in nature or failed to describe with reasonable certainty the damages
sustained. Thus, we cannot say that the jury's actual damages award, viewed in a neutral
light, was so contrary to the overwhelming weight of the evidence as to be clearly wrong or
unjust. See Cain, 709 S.W.2d at 176. Accordingly, we uphold the jury's actual damages
award and overrule SJW's third issue to the extent that it challenges the sufficiency of the
jury's actual damages award.

B. The Jury's Award of Exemplary Damages Against SJW

 1. Standard of Review

 Exemplary damages must be established by clear and convincing evidence, thus
requiring an elevated standard of review. Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 627
(Tex. 2004); see Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon Supp. 2009)
(providing also that an exemplary damage award may be premised on a jury's finding that
the defended engaged in fraud, malice, or gross negligence). Clear and convincing
evidence is that "measure or degree of proof that will produce in the mind of the trier of fact
a firm belief or conviction as to the truth of the allegations sought to be established." Tex.
Civ. Prac. & Rem. Code Ann. § 41.001(2) (Vernon 2008); see Transp. Ins. Co. v. Moriel, 879
S.W.2d 10, 31 (Tex. 1994). This intermediate standard falls between the preponderance
standard of civil proceedings and the reasonable doubt standard of criminal proceedings. 
In re G.M., 596 S.W.2d 846, 847 (Tex. 1980); State v. Addington, 588 S.W.2d 569, 570
(Tex. 1979); see Strange, 256 S.W.3d at 775. "While the proof must weigh heavier than
merely the greater weight of the credible evidence, there is no requirement that the
evidence be unequivocal or undisputed." Strange, 256 S.W.3d at 775 (citing Addington,
588 S.W.2d at 570). 

B. Discussion

 On appeal, SJW specifically asserts that: (1) the evidence supporting the jury's
malice finding is legally and factually insufficient; and (2) the "cap buster" provisions of
section 41.008 of the civil practice and remedies code were not properly pleaded; therefore,
the jury's exemplary damages award was excessive. (26)

 1. The Jury's Malice Finding

 Under legal sufficiency review, when a jury makes an affirmative finding of malice,
we review all of the evidence in the light most favorable to the jury's finding, taking into
account contrary disputed facts, to determine whether reasonable jurors could have formed
a firm belief or conviction regarding malice. Qwest Int'l Commc'ns, Inc. v. AT&T Corp., 167
S.W.3d 324, 326 (Tex. 2005); see also Garza, 164 S.W.3d at 627; In re J.F.C., 96 S.W.3d
256, 266 (Tex. 2002). Under factual sufficiency review, we give due consideration to any
evidence the fact finder could reasonably have found to be clear and convincing. In re
J.F.C., 96 S.W.3d at 266. We must consider the disputed evidence and determine whether
a reasonable fact finder could have resolved that evidence in favor of the finding. Id. The
evidence is factually insufficient if, in light of the entire record, the disputed evidence that
a reasonable fact finder could not have credited in favor of its finding is so significant that
a fact finder could not have reasonably formed a firm conviction or belief. Id.

 Here, question number 25 of the charge asked the jury whether there was "clear and
convincing evidence that the harm to G.J. Palmer, Jr. resulted from malice." The charge
further explained that "'[m]alice' means a specific intent by SJW Property Commerce, Inc.
to cause substantial injury or harm to G.J. Palmer, Jr." See Tex. Civ. Prac. & Rem. Code
Ann. § 41.001(7) (defining malice as "a specific intent by the defendant to cause substantial
injury or harm to the claimant"). The jury answered in the affirmative to question number
25 of the charge. The Palmer companies were subsequently awarded $2 million in
exemplary damages against SJW. The trial court's final judgment adopted the jury's
exemplary damages award. 

 The evidence shows that Stanley and Jay Williams and Trozzo were all associated
with SJW and that their actions served as the basis of the Palmer companies' causes of
action. Stanley testified that he had retired ten to twelve years prior to this dispute and that
he merely facilitated the development of the Trenton Project. However, Stanley later
appeared to contradict himself when he admitted that he consults with Jay Williams, the
president and owner of SJW, about deals "about every hour." Furthermore, Palmer alleged
that Stanley was heavily involved in the development of the Trenton Project because
Stanley directed the actions of Jay Williams and Trozzo, and Stanley met with Palmer to
negotiate the assignment of Palmer's earnest money contracts in exchange for the REA. 
In addition, prior to negotiating the assignment of Palmer's earnest money contract in
exchange for the REA, Stanley agreed to no longer allow Jay Williams and Trozzo to be
involved in the development of the Trenton Project. However, shortly after negotiations
were finalized, Trozzo bid up the price of the Kayser tract in an apparent attempt to render
Palmer's REA worthless. 

 Moreover, the record reflects that: (1) Jay Williams actively participated in the
development of the Trenton Project; (2) several witnesses recalled seeing Jay Williams at
various meetings to discuss the progress of the Trenton Project; and (3) Jay Williams
signed most of the relevant documents in this dispute in his capacity as president of SJW. 
Trozzo, Jay Williams's brother-in-law, testified that: (1) he is "an independent contractor"
who works for SJW; and (2) as an employee of SJW, he typically takes direction from Jay
Williams. 

 In addition, Dr. Kilgore testified as to SJW's actions to get him under contract to tie
up the Trenton Project until Palmer's earnest money contracts expired so that SJW could
develop the property itself. Furthermore, Wayne Allen testified that the landowners were
approached by Trozzo to induce them to terminate their contracts with Palmer and sign new
contracts with SJW. These actions transpired all the while Palmer, Schwarz, and the
landowners believed that SJW was acting as Palmer's broker on the development project. 
In fact, Charles Ray Porter Jr., a commercial real estate broker and expert, testified at trial
that he reviewed the depositions, documents, and pleadings in this case and the Real
Estate License Act and other ethical rules promulgated by the Texas Real Estate
Commission and, based on that information, concluded that an agency relationship existed
between SJW and Palmer at the Trenton Project. 

 Another expert, Mark Freeland, a McAllen attorney who board certified in residential,
commercial, and farm and ranch real estate law, confirmed Porter's findings and testified
that he believed SJW began working as Palmer's broker at the Trenton Project in 2000. 
Freeland also noted that the correspondences between SJW and Palmer did not contain
a correspondence from SJW expressing that it was not Palmer's broker at the Trenton
Project. Freeland stated that the course of conduct between SJW and Palmer at the
Trenton Project gave rise to an agency relationship and that the expiration of the Listing
Agreement at the Jackson Palmer Crossing site had no bearing on the existence of the
agency relationship at the Trenton Project. Porter and Freeland's conclusions as to agency
were contested by SJW; however, the jury ultimately concluded that an agency relationship
existed between SJW and Palmer.

 The record also demonstrates that Palmer regularly discussed confidential pricing
and contractual information with Stanley and Jay Williams at various meetings, even though
SJW later argued at trial that the parties were competitors. However, SJW never once
disclosed to Palmer that the parties were competitors, nor did it request that Palmer
discontinue revealing confidential information regarding the Trenton Project. 

 We find that the evidence supports a finding that SJW authorized, ratified, or adopted
the acts of malice perpetrated by Stanley and Jay Williams and Trozzo, and that, in
particular, Jay Williams, president of SJW, participated in the wrongful conduct that
transpired at the Trenton Project. See Qwest Int'l Commc'ns, 167 S.W.3d at 326 (stating
that a corporation is liable for exemplary damages only if it: (1) authorizes or ratifies an
agent's malice, (2) maliciously hires an unfit agent, or (3) acts with malice through a vice
principal) (citing Mobil Oil Corp. v. Ellender, 968 S.W.2d 917, 921-22 (Tex. 1998);
Hammerly Oaks, Inc. v. Edwards, 958 S.W.2d 387, 391 (Tex. 1997) (defining a "vice
principal" as (1) a corporate officer; (2) those who have authority to employ, direct, and fire
employees; (3) those who engage in non-delegable duties; and (4) those is charge of the
management of a department or division of the business)). In reviewing the evidence in the
light most favorable to the jury's malice finding, we conclude that reasonable jurors could
have formed a firm belief or conviction regarding malice. See Qwest Int'l Commc'n, Inc.,
167 S.W.3d at 326; see also Garza, 164 S.W.3d at 627; In re J.F.C., 96 S.W.3d at 266. We
further conclude that, in light of the entire record, the jury was reasonable in concluding that
SJW's actions at the Trenton Project were malicious. See In re J.F.C., 96 S.W.3d at 266. 


 2. The "Cap Buster" Provisions of the Texas Civil Practice and Remedies
Code 


 Section 41.008 of the civil practice and remedies code allows for the recovery of two
times the amount of economic damages plus an amount equal to any non-economic
damages found by the jury, not to exceed $750,000. See Tex. Civ. Prac. & Rem. Code Ann.
§ 41.008 (Vernon Supp. 2009). "[T]he amount of exemplary damages to be awarded is
within the discretion of the trier of fact." Id. § 41.010(b) (Vernon 2008). The following
factors are relevant to the assessment of the amount of exemplary damages that should
be assessed against a tortfeasor: (1) the nature of the wrong; (2) the character of the
conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and
sensibilities of the parties concerned; (5) the extent to which the conduct offends a public
sense of justice and propriety; and (6) the net worth of the defendant. Id. § 41.011(a)
(Vernon 2008). In our opinion, we must "address the evidence or lack of evidence with
specificity" as it relates to the statutory requirements. Id. § 41.013(a) (Vernon 2008). 

 On April 10, 2007, SJW first invoked section 41.008's exemplary damages cap. This
filing preceded the commencement of the trial in this dispute by six days. (27) The Palmer
companies filed their opposition to SJW's April 10, 2007 filing, alleging that the filing was
prejudicial on its face and requesting that SJW's motion for leave be denied. See Chapin
& Chapin, Inc. v. Tex. Sand & Gravel Co., 844 S.W.2d 664, 664 (Tex. 1992) (per curiam)
("Rule 63, [of the Texas Rules of Civil Procedure] states that pleadings may be amended
within seven days of trial only after leave of the judge is obtained, which leave shall be
granted by the judge unless there is a showing that such filing will operate as a surprise to
the opposite party."); see also Tex. R. Civ. P. 63. Texas courts have held that the punitive
damage cap must be pleaded and proved. See Shoreline, Inc. v. Hisel, 115 S.W.3d 21, 25
(Tex. App.-Corpus Christi 2003, pet. denied) ("Where maximum damages are provided in
statutes in Texas, and a defendant wants to rely on the cap, it is considered a defense that
must be plead[ed] and proved.") (citing Tex. R. Civ. P. 94; Horizon/CMS Healthcare Corp.
v. Auld, 34 S.W.3d 887, 896-97, 904-05 (Tex. 2000)); see also Marin v. IESI TX Corp., No.
01-08-00539-CV, 2010 Tex. App. LEXIS 981, at *45 (Tex. App.-Houston [1st Dist.] Feb. 11,
2010, no pet. h.) (mem. op.) (noting that section 41.008's exemplary damages cap is an
affirmative defense that must be pleaded); Wackenhut Corr. Corp. v. De La Rosa, No. 13-06-00692-CV, 2009 Tex. App. LEXIS 2262, at *157 (Tex. App.-Corpus Christi Apr. 2, 2009,
no pet.) (same). Moreover, the failure to raise a new defense via an amended pleading
more than seven days before trial without leave constitutes surprise and is prejudicial on its
face if it does not give plaintiff "fair notice" of defendant's intent to invoke the cap. See
Chapin & Chapin, Inc., 844 S.W.2d at 664; see also Horizon/CMS Healthcare Corp., 34
S.W.3d at 896-97.

 Here, the record does not reflect that the trial court granted SJW leave to file its late
April 10, 2007 pleading first asserting the exemplary damages cap. See Tex. R. Civ. P. 63. 
Therefore, because the record does not demonstrate that the trial court granted SJW leave
to file its April 10, 2007 pleading, we find that SJW's late filing did not give the Palmer
companies "fair notice" of the new defense and, thus, constituted a surprise. (28) See Tex. R.
Civ. P. 63. Moreover, because SJW was required to properly plead section 41.008's
exemplary damages cap and failed to do so, we conclude that the damages cap was not
properly before the trial court.

 Based on our review of the record, we further conclude that the Palmer companies
proved by clear and convincing evidence that they were entitled to an exemplary damages 
award based on SJW's malicious conduct at the Trenton Project. See Garza, 164 S.W.3d
at 627; see also Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a). Employing the proper
standards of review, we hold that the evidence supporting the jury's exemplary damage
award is legally and factually sufficient. See Qwest Int'l Commc'n, Inc., 167 S.W.3d at 326;
see also Garza, 164 S.W.3d at 627; In re J.F.C., 96 S.W.3d at 266. Accordingly, we
overrule SJW's third issue as it pertains to the jury's exemplary damages award. 

VI. Attorney's Fees and Expenses Awarded to Palmer

 In their fourth and final issue, SJW argues that the Palmer companies are not entitled
to attorney's fees because a plaintiff in a tortious interference with an existing contract
cause of action may only recover actual damages rather than attorney's fees. SJW further
argues that the Palmer companies cannot recover attorney's fees under article 6.04 of the
Listing Agreement because the Palmer companies did not prevail on the cause of
action--the failure to pay commissions for bringing tenants to the Jackson Palmer Crossing
shopping center--brought under the Listing Agreement. The Palmer companies claim
entitlement to the jury's attorney's fees award because they prevailed on their counterclaims
and the Listing Agreement provides that attorney's fees may be awarded to the prevailing
party for any action or proceeding relating to the agreement. 

A. Standard of Review and Applicable Law

 An award of attorney's fees is reviewed under an abuse of discretion standard. Dail
v. Couch, 99 S.W.3d 390, 391 (Tex. App.-Corpus Christi 2003, no pet.) (citing Ragsdale
v. Progressive Voters League, 801 S.W.2d 880, 881 (Tex. 1990)). The test for abuse of
discretion is to determine whether the trial court acted without reference to any guiding rules
or principles, or whether, under the circumstances of the case, the trial court's actions were
arbitrary or unreasonable. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42
(Tex. 1985).

 "Under the American Rule, litigants' attorney's fees are recoverable only if authorized
by statute or by a contract between the parties." Intercontinental Group P'ship v. KB Home
Lone Star, L.P., 295 S.W.3d 650, 653 (Tex. 2009) (citing MBM Fin. Corp. v. Woodlands
Operating Co., 292 S.W.3d 660, 669 (Tex. 2009) (citing Tony Gullo Motors I, L.P. v. Chapa,
212 S.W.3d 299, 310-11 (Tex. 2006))). Section 38.001 of the civil practice and remedies
code provides that reasonable attorney's fees may be recovered:

 from an individual or corporation, in addition to the amount of a valid claim
and costs, if the claim is for: 

 

 (1) rendered services;

 (2) performed labor;

 (3) furnished material;

 (4) freight or express overcharges;

 (5) lost of damaged freight or express;

 (6) killed or injured stock;

 (7) a sworn account; or

 (8) an oral or written contract.

Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 2008). The supreme court has held
that "before a party is entitled to fees under section 38.001, that 'party must (1) prevail on
a cause of action for which attorney's fees are recoverable, and (2) recover damages.'" KB
Home Lone Star, L.P., 295 S.W.3d at 653 (citing Green Int'l, Inc. v. Solis, 951 S.W.2d 384,
390 (Tex. 1997)). 

B. Discussion

 The record reflects that the parties submitted their attorney's fees calculations to the
trial court by agreement. (29) See Tittizer v. Union Gas Corp., 171 S.W.3d 857, 860 (Tex.
2005) (per curiam) ("As a general rule, the doctrine of estoppel precludes a litigant from
requesting a ruling from a court and then complaining that the court committed error in
giving it to him."); see also Naguib v. Naguib, 137 S.W.3d 367, 375 (Tex. App.-Dallas 2004,
pet. denied) (recognizing the "invited error" doctrine and noting that "[a] party to a lawsuit
cannot ask something of a trial court and then complain on appeal that the trial court
committed error in granting that party's request"). In any event, after reviewing the Listing
Agreement and the testimony adduced at trial, we agree with SJW that the Listing
Agreement is not an adequate basis for awarding the Palmer companies attorney's fees
because the unambiguous language of the Listing Agreement solely pertains to the Jackson
Palmer Crossing site. Our earlier conclusion that the disputes at Jackson Palmer Crossing
and the Trenton Project constituted a single transaction or occurrence centered on the
parties' relationship, conduct, and correspondence with one another rather than construing
the breadth of the Listing Agreement to include the Trenton Project. Nowhere in the Listing
Agreement do the parties indicate that they intended for the agreement to cover properties
other than those situated at the Jackson Palmer Crossing site.

 SJW only cites us to one case supporting its contention that a plaintiff cannot recover
attorney's fees for an action for tortious interference with an existing contract. See
Browning-Ferris, Inc. v. Reyna, 852 S.W.2d 540, 549 (Tex. App.-San Antonio 1992), rev'd
on other grounds, 865 S.W.2d 925 (Tex. 1993). The Reyna case, however, does not
mention the propriety of an attorney's fees award in a tortious interference with an existing
contract claim. See id. Therefore, we do not find this case to be persuasive as to this issue
and, in turn, reject SJW's contention that the Palmer companies were not entitled to
attorney's fees on their tortious interference with an existing contract claim. 

 As noted previously, the disputes at Jackson Palmer Crossing and the Trenton
Project are related so as to constitute a single transaction or occurrence. The crux of the
dispute pertaining to the Trenton Project involves SJW's rendering of brokerage services,
or lack thereof, to the Palmer companies, which falls under the purview of section 38.001
of the civil practice and remedies code. See Tex. Civ. Prac. & Rem. Code Ann. § 38.001(1). 
The trial court did not abuse its discretion in awarding the Palmer companies attorney's fees
because SJW was judicially estopped from complaining about the attorney's fees award
given that SJW and the Palmer companies submitted their attorney's fees requests by
agreement and because the Palmer companies prevailed and were awarded damages on
their counterclaims, which were based on SJW's rendering of brokerage services, or lack
thereof, at the Trenton Project. See id.; see also KB Home Lone Star, L.P., 295 S.W.3d at
653; Downer, 701 S.W.2d at 241-42; Dail, 99 S.W.3d at 391. Accordingly, we overrule
SJW's fourth issue. 

VII. Sufficiency of the Evidence that Appellees Wrongfully Withheld the Payment
of Commissions Associated with Jackson Palmer Crossing

 

 By their sole cross-issue, the Palmer companies contend that the jury's award for
commissions associated with the Jackson Palmer Crossing shopping center is not
supported by legally and factually sufficient evidence. Specifically, the Palmer companies 
argue that the Listing Agreement was not enforceable because it lacked an adequate
description of the property involved. SJW responds by arguing that the evidence supports
the jury's finding that commissions were owed by the Palmer companies, especially
considering Palmer's admissions at trial that he owed the commissions and that SJW
brought several tenants to the Jackson Palmer Crossing shopping center. SJW also
asserts that the Palmer companies' argument that the contract was unenforceable "is both
untenable and unsupported in law or fact."

A. Applicable Law

 In arguing that the Listing Agreement was an unenforceable contract, the Palmer
companies rely on section 1101.806(c) of the Texas Occupations Code. See Tex. Occ.
Code Ann. § 1101.806(c) (Vernon 2004). Section 1101.806(c) provides as follows:

 A person may not maintain an action in this state to recover a commission for
sale or purchase of real estate unless the promise or agreement on which the
action is based, or a memorandum, is in writing and signed by the party
against whom the action is brought or by a person authorized by that party to
sign the document.


Id.; see Trammel Crow Co. No. 60 v. Harkinson, 944 S.W.2d 631, 633 (Tex. 1997). 

B. Discussion

 On appeal, the Palmer companies complain about a document, labeled "Exhibit A,"
which was attached to the Listing Agreement and presented at trial. Palmer testified at trial
that "Exhibit A" was a "site plan" for the Jackson Palmer Crossing development "that was
never part of the original agreement." The Palmer companies allege that the failure to
tender "Exhibit A" at the time the document was signed made the Listing Agreement
unenforceable because it did not contain an adequate description of the property in
question. The Palmer companies also allege that section 1101.806(c) required that the
Listing Agreement contain an adequate description of the property. We disagree with the
Palmer companies' contentions.

 With respect to "Exhibit A," the Listing Agreement provided that:

 WHEREAS, Owner owns the Property described as Exhibit "A" attached
hereto and made a party herein by reference, the improvements and fixtures
thereon, and all appurtenances thereto (said land, improvements, fixtures and
appurtenances and any personal property of Owner on said land or in such
improvements being herein called the "Property"). This Property is located at
the intersection of business highway 83 and Jackson Road in McAllen, Texas
and Pharr, Texas. 

"Exhibit A" is a drawing labeled "Site Master Plan," which clearly references all the property
in question. The Listing Agreement further provides that SPP, in particular, was responsible
for paying SJW a 6% sales commission, a 4% commission for "total lease rental for the
primary term (years 1-10)" and a 2% commission "of the total rental for the primary term
(years 11-20) of each lease if Broker is the sole source of tenant." 

 In the instant case, Palmer did not complain about "Exhibit A" until trial. Based on
the testimony at trial, it is clear to us that the parties understood to which property the
Listing Agreement applied. In addition, the version of the Listing Agreement admitted into
evidence as "Plaintiff's Exhibit 1" included "Exhibit A" and described the property in question
with reasonable certainty. See Tex. Builders v. Keller, 928 S.W.2d 479, 481 (Tex. 1996)
(citing Morrow v. Shotwell, 477 S.W.2d 538, 539 (Tex. 1972) ("A writing need not contain
a metes and bounds property description to be enforceable; however, it must furnish the
data to identify the property with reasonable certainty.")); see also Duncan v. F-Star Mgmt.,
L.L.C., 281 S.W.3d 474, 478-79 (Tex. App.-El Paso 2008, pet. filed). 

 The thrust of the Palmer companies' argument as to this issue appears to be that
"Exhibit A" was not tendered to Palmer at the time of signing and, therefore, the Listing
Agreement was unenforceable because it lacked an adequate property description. The
Palmer companies cite to Palmer's testimony at trial that he first saw "Exhibit A" attached
to the Listing Agreement when reviewing a lien filed by SJW in 2000. Despite the above-mentioned statements, we note that it was within the province of the jury to reconcile
Palmer's allegations that the "Exhibit A" was not presented to him at the time he signed the
agreement on behalf of SPP with the version of the Listing Agreement admitted into
evidence, which clearly references "Exhibit A," includes a copy of "Exhibit A," and provides
a description of the property at issue. See City of Keller, 168 S.W.3d at 819. In concluding
that the Palmer companies were responsible for paying commissions on the Staples and
Fashion Bug leases and that the Palmer companies were not excused from compliance with
the Listing Agreement, the jury clearly believed that the Listing Agreement was enforceable
and that "Exhibit A" was tendered at the time of signing. (30) Because the Palmer companies
have not directed us to any evidence in the record, other than Palmer's own self-serving
testimony, demonstrating that the jury was unreasonable in its conclusions pertaining to the
leases at Jackson Palmer Crossing, and because we find none, we must defer to the jury's
implicit conclusion that the "Exhibit A" was presented to Palmer at the time of signing the
Listing Agreement and that the agreement was enforceable. See id. 

 Moreover, in reviewing section 1101.806(c), we find that the statute merely requires
that an agreement to sell or purchase real estate be in writing and signed by the party
against whom an action is brought, which does not appear to support the Palmer
companies' argument that the Listing Agreement is unenforceable. See Tex. Occ. Code
Ann. § 1101.806(c). We therefore reject the Palmer companies' argument that the Listing
Agreement was unenforceable because it lacked an adequate property description. (31) 

 With respect to the Palmer companies' legal and factual sufficiency arguments, we
find that the evidence contained in the record supports the jury's verdict. In fact, the record
reflects that both SJW and SPP signed the Listing Agreement. Furthermore, Palmer
admitted at trial that he owed commissions to SJW for work done at the Jackson Palmer
Crossing shopping center but that he chose to withhold the payment of commissions
because of what had transpired between himself and SJW at the Trenton Project. See
Mendoza v. Fid. & Guar. Ins., 606 S.W.2d 692, 694 (Tex. 1980) (holding that testimony is
a judicial admission); AEP Tex. Cent. Co. v. Pub. Util. Comm'n of Tex., 286 S.W.3d 450,
469, n.24 (noting that a "judicial admission is binding on the party admitting it, and he may
not introduce contradicting evidence") (citing Cameron County v. Velasquez, 668 S.W.2d
776, 782 (Tex. App.-Corpus Christi 1984, writ ref'd n.r.e.)); see also Tex. Dep't of Pub.
Safety v. Morales, No. 13-07-00552-CV, 2008 Tex. App. LEXIS 3898, at *6 (Tex.
App.-Corpus Christi May 22, 2008, no pet.) (mem. op.). The record also contains a letter
sent by Palmer to SJW recognizing that SJW was owed commissions for work done at the
Jackson Palmer Crossing shopping center and requesting additional time to make such
payments. The Listing Agreement provides that it was effective from June 30, 1999 to June
30, 2000, and the record reflects that SJW facilitated the signing of leases by Staples and
Fashion Bug at the Jackson Palmer Crossing shopping center during the term of the Listing
Agreement. (32) 

 In reviewing the evidence in the light most favorable to the jury's findings, we
conclude that the jury was reasonable in concluding that the Palmer companies were
responsible for paying commissions to SJW on the Staples and Fashion Bug leases. See
City of Keller, 168 S.W.3d at 807, 810-11. Furthermore, in reviewing the evidence in a
neutral light, we cannot conclude that the jury's findings as to this issue were so contrary
to the overwhelming weight of the evidence as to be clearly wrong or unjust. See Cain, 709
S.W.2d at 176. Accordingly, we find that the evidence is legally and factually sufficient, and
we overrule the Palmer companies' sole cross-issue. See City of Keller, 168 S.W.3d at
807, 810-11; see also Cain, 709 S.W.2d at 176. 

VIII. Conclusion

 Based on the foregoing, we reverse the jury's award of $376,397 in punitive
damages against PCDC and render judgment that the Palmer companies take nothing as
to PCDC. However, because the trial court concluded that SJW and PCDC were jointly and
severally liable for the jury's award of $709,587 in actual damages, we affirm the jury's
damages awards against SJW. Moreover, we affirm the remaining aspects of the trial
court's judgment. 

 ROGELIO VALDEZ

 Chief Justice

 


Delivered and filed the 

28th day of April, 2010. 
1. Stanley J. Williams is the father of Stanley Jay Williams Jr. The record reflects that Stanley Jay
Williams, also known as Jay Williams, owns and controls SJW and PCDC, while Stanley Williams serves as
a retired consultant. Stanley Williams testified at trial that he is consulted by Jay Williams about deals
involving SJW and PCDC "about every hour."
2. Palmer owns and operates SPP, Jackson, and PE.
3. Additionally, pursuant to a "Development Consultant Agreement" between Palmer and Property
Commerce Management Company, SJW, after contacting several different "big box" retailers, was able to
secure Home Depot as the anchor tenant at the Jackson Palmer Crossing shopping center. As a result of
its efforts, SJW was paid a $74,100 development fee by Palmer. The "Development Consultant Agreement"
is not disputed in this case. 
4. Palmer executed earnest money contracts with: (1) B.R. Whisenant for 1.99 acres for $467,712.50,
or, in other words, $10 per square foot; (2) Wayne and Gelee Allen for 1.07 acres; (3) Bill and Opal Baldwin
for 2.36 acres for $282,277 or, in other words, $2.75 per square foot; (4) Yvonne Robinson for 3.81 acres for
$414,635, or, in other words, $2.50 per square foot; and (5) Harlon and Mary Robinson for 5.82 acres for
$532,362, or, in other words, $2.10 per square foot. The record does not contain a contract for Wayne and
Gelee Allen executed at the time of the others; however, Wayne testified via deposition that he and his wife
did execute an earnest money contract with Palmer at this time. Moreover, testimony was adduced at trial
as to the discrepancy in the prices for each tract of land. Real estate experts testified that the price of a tract
of land is dependant upon how it is situated in relation to streets or areas of high traffic. Whisenant received
a higher offer than the others because his land is situated nearest to the corner of 10th Street and Trenton,
a heavy traffic area, while the other tracts are situated further away from the intersection.
5. The April 15, 2000 expiration date was allegedly extended by agreement with the landowners and
Palmer. Testimony at trial reveals that the landowners granted Palmer an additional 180 days to determine
the feasibility of the Trenton Project.
6. Dr. Kilgore testified at trial that Palmer and the other landowners approached him several times in
order to coax him to sell the land to Palmer; however, Dr. Kilgore ignored most of the communications and
insisted on dealing directly with Target rather than any middlemen or local realtors and land purchasers. 
7. As a part of his deal with PCDC, Dr. Kilgore was offered $1,128,204 for his 3.7-acre tract. 
8. The record contains several letters from Palmer addressed to Trozzo, requesting information
regarding the purchasing of Dr. Kilgore's tract of land and stating that time was of the essence.
9. Wayne Allen testified via deposition that he and the other landowners were approached by SJW and
PCDC while the landowners were still under contract with Palmer. The landowners were encouraged by SJW
and PCDC to break their contracts with Palmer; however, several of the landowners refused to do so because
they did not desire to do business with SJW and PCDC. Dr. Kilgore testified via deposition that he was
approached by Trozzo, who represented that he was from Target rather than SJW or PCDC. Dr. Kilgore had
previously informed all parties that he preferred to deal directly with Target representatives. In any event, Dr.
Kilgore recalled a conversation he had with Trozzo where Trozzo noted that Palmer was trying to assemble
the tracts of land for development but Trozzo wanted to get Dr. Kilgore under contract and wait until Palmer's
earnest money contracts expired so that SJW and PCDC could develop the land themselves. 
10. During its representation of Palmer, Trammell Crow sent a letter to Schwartz regarding the Trenton
Project, which stated: "Furthermore, in the presence of Home Depot, Jay Williams assured us [Trammell
Crow] that he would assign the Doctor's contract to us if Jay Palmer pays to Property Commerce commissions
allegedly owed to them for two (2) deals that were completed at Jackson Palmer Crossing."
11. In his testimony, Palmer referenced an email from Charles Thompson, an architect for SJW,
regarding the Trenton Project. In his email, Thompson instructed Larry Heimer, a civil engineer doing work
at the Trenton Project, to: "Do not send Jay Palmer a plan showing the lease space next to Target and/or the
Chick-[F]il-A plan. [SJW] Property Commerce does not want him having that information."
12. The record reflects that Palmer tendered earnest money for the contracts contained in the record;
however, the contracts do not reflect that the title company received the earnest money. In other words, the
earnest money does not appear to be "receipted" by the title company. Palmer testified that he provided
Schwartz with the earnest money that was to be provided to the title company. Schwartz noted that he
received the earnest money, thus corroborating Palmer's testimony regarding the earnest money; however,
Schwartz could not recall why the earnest money was not deposited with the title company. In any event, the
landowners never sought to terminate their contracts with Palmer until they were approached by SJW and
PCDC. 
13. Article 6.04 of the Listing Agreement provides, as follows:


 6.04 If either party hereto shall institute any action or proceeding against the other party
hereto relating to this Agreement, the successful party in such action or proceeding
shall be entitled to recover from the unsuccessful party all fees and expenses
incurred in connection therewith, including court costs, reasonable attorneys' fees
and related expenses.
14. The record reflects that SJW and PCDC abandoned their civil conspiracy cause of action against
SPP, Jackson, PE, and Palmer. Moreover, SJW's statutory fraud claim was dismissed earlier in the case.
15. The sum of the figures mentioned in the jury's answer to question number 22 is $709,587. The trial
court, in its final judgment, stated that SJW and PCDC were jointly and severally liable for the $709,587 in
actual damages awarded by the jury in question number 22. See Kinzbach Tool Co., Inc. v. Corbett-Wallace
Corp., 138 Tex. 565, 160 S.W.2d 509, 514 (1942) (holding that wrongdoers may be held jointly and severally
liable if the victim establishes that only one breached a fiduciary duty owed to the victim and that the other
knowingly participated therein); see also Jung Fu Chien v. Chen, 759 S.W.2d 484, 487 (Tex. App.--Austin
1988, no writ) (same).
16. The record does not contain a written order ruling on the parties' various post-judgment motions;
however, the apparent failure to rule of these motions is not the basis of this appeal.
17. In its February 7, 2008 final judgment, the trial court noted that the parties had submitted affidavits
with the attorney's fees requests and subsequently awarded SJW $55,767.91 in attorney's fees and the
Palmer companies $289,582 in attorney's fees and $100,570.23 in expenses.
18. The parties do not challenge whether the Palmer companies' counterclaims were filed within the
proper time frame after SJW and PCDC filed their original petition and the Palmer companies filed their
original answer. See Tex. Civ. Prac. & Rem. Code Ann. § 16.069(b) (Vernon 2008). In their appellate brief,
the Palmer companies merely state that the counterclaims were timely filed; moreover, SJW and PCDC never
address this statement in their response to the Palmer companies' appellate brief.
19. Because we later hold that SJW and PCDC's failure to attack the jury's findings regarding the
independent causes of action for fraud and breach of fiduciary duty requires us to affirm the jury's liability
findings, we need not analyze SJW and PCDC's limitations argument pertaining to the Palmer companies'
tortious interference with existing contracts and prospective business relations causes of action. See infra
Part IV; see also Tex. R. App. P. 47.1.
20. Section 16.069 of the civil practice and remedies states as follows:


 (a) If a counterclaim or cross claim arises out of the same transaction or occurrence that is
the basis of an action, a party to the action may file a counterclaim or cross claim even
though as a separate action it would be barred by limitation on the date the party's answer
is required. 

 

 (b) The counterclaim or cross claim must be filed not later than the 30th day after the date
on which the party's answer is required.


Tex. Civ. Prac. & Rem. Code Ann. § 16.069 (Vernon 2008). 
21. The Palmer companies do not cite, nor are we aware of, authority supporting the application of the
relation-back doctrine to time-barred claims against a third-party that may be "closely related, if not identical"
to a properly named party to a lawsuit.
22. Because we have concluded that the Palmer companies' claims against PCDC were time-barred,
we only reference SJW as appellant/cross-appellee for the remaining issues in this case.
23. SJW did not challenge, in the trial court, the charge's wording regarding the actual damages award
and the fact that the question pertaining to actual damages is not attributed to a particular cause of action. 
See Religious of the Sacred Heart of Tex. v. City of Houston, 836 S.W.2d 606, 613-14 (Tex. 1992) (holding
that any complaint as to the wording of the jury charge is waived if a proper objection is not made in the trial
court).
24. Abington testified that when he made his conclusions, he did not have contracts for two of the
landowners that conclusively established effectiveness in April 2000, which appears to contradict the
testimony of Palmer, Wayne Allen, and Schwarz that the contracts existed. Abington did note that he did have
contracts for all five landowners that were effective in October 2000. For the two April 2000 contracts that
were allegedly missing, Abington used the prices quoted in the corresponding October 2000 contracts and
adjusted them by 3.85% to "roll them back to April 2000 prices," which was a low estimate for the price
difference between April 2000 and October 2000, based on the average price differentials for Palmer's other
earnest money contracts. Abington stressed that such calculations were necessary because, as a damages
expert, he is charged with determining "[w]hat would have reasonably been expected to have occurred" and
because that was what was contemplated to happen in April 2000, by the Palmer companies. 
25. Target eventually acquired the property for approximately $3.98 per square foot.
26. SJW also argues that the jury's exemplary damage award was erroneous because the Palmer
companies did not "submit a question asking if an employee of PCDC committed an intentional tort." 
However, because we have concluded that the Palmer companies' claims against PCDC are time-barred, we
need not address this contention. See Tex. R. App. P. 47.1.
27. Trial in this matter commenced on April 16, 2007.
28. In fact, the Palmer companies argue on appeal that it did not have time to specifically plead any
"cap busting" theories because of SJW's late filing. Moreover, the Palmer companies highlight the fact that
SJW did not object to any of the charge questions that pertained to damages. See Allen v. Am. Natural Ins.
Co., 380 S.W.2d 604, 609 (Tex. 1964) ("'Where, however, the ground (of recovery or defense) is submitted,
however erroneously or incompletely, the parties are thereby put upon notice that the jury's answers to the
issues actually submitted will form the basis of the court's judgment thereafter to be rendered thereon. It then
becomes the duty of each party to point out errors of omission or commission, or be held estopped from
thereafter urging them.'") (quoting Panhandle & S. F. Ry. Co. v. Friend, 91 S.W.2d 922, 930 (Tex. Civ.
App.-Austin 1936, no writ)) (emphasis in original).
29. In support of their attorney's fees request, the Palmer companies tendered affidavits from co-counsel at trial, Sarah Pierce Cowen and John R. Griffith, requesting $289,582 as reasonable attorney's fees
and $100,570.23 in reasonable expenses. On appeal, SJW does not challenge the reasonableness of the
Palmer companies' attorney's fees requests. 
30. Question number 10 of the jury charge provided the following with respect to the Palmer companies' 
failure to pay SJW commissions at the Jackson Palmer Crossing:


 Was G.J. Palmer, Jr.'s failure to comply [with the Listing Agreement's requirement to pay
commissions to SJW for bringing tenants to the Jackson Palmer Crossing shopping center]
excused?

 

 Compliance is excused if:

 

 a. The agreement between G.J. Palmer, Jr. and SJW Property Commerce, Inc. is not
in writing; or

 

 b. The agreement between G.J. Palmer, Jr. and SJW Property Commerce, Inc. is not
signed by G.J. Palmer, Jr.; or

 

 c. The agreement between G.J. Palmer, Jr. and SJW Property Commerce, Inc. does
not describe the property subject to the agreement with reasonable certainty; or

 

 d. SJW Property Commerce, Inc. breached its fiduciary duty to G.J. Palmer, Jr.

 

 Answer: No


(Emphasis added.)
31. We find it ironic that the Palmer companies request that we find the Listing Agreement to be
unenforceable as to the payment of commissions to SJW, yet the Palmer companies use article 6.04 of the
same "unenforceable" Listing Agreement to argue entitlement to attorney's fees.
32. On appeal, SJW does not claim entitlement to commissions that may be associated with the
Factory 2-U lease at the Jackson Palmer Crossing shopping center.